# REPUBLIC OF HAWAII *v.* YAMANE NENCHIRO, OSAKI MANKICHI and IHARA ICHIGORO.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

FREAR AND WHITING, JJ., AND CIRCUIT JUDGE STANLEY, IN PLACE OF JUDD, C.J., ABSENT THROUGH ILLNESS.

SUBMITTED JULY 12, 1899.           DECIDED NOVEMBER 17, 1899.

It is not essential that the testimony at the preliminary examination of a person accused of a crime should be taken by the hands of the committing magistrate himself. It suffices if it be done under his supervision and direction.

Where the accused is committed for trial the indictment presented against him must be for the offense charged in the complaint upon which he was examined or one included therein, but the prosecuting officer is not limited by it in the mode of charging the offense. It is competent for him, so long as he does not undertake to proceed against the accused for a different transaction, to put his information or indictment in such form as will enable him to try the offense on its merits.

An indictment for murder in the first degree contained several counts, one charging the killing "with deliberate premeditated malice aforethought" and another charging the killing with "extreme atrocity or cruelty," held that the different counts merely charge the same offense in different ways.

Where two persons, A and B, had been killed at the same time under the same circumstances, it was competent to admit evidence of the killing of B as a part of the *res gestae*, although the killing of A alone was charged in the indictment.

The defendants were Japanese. Witnesses for the prosecution gave their evidence in English, Portuguese, Chinese and Hawaiian languages which was interpreted into English by sworn interpreters,

but was not again interpreted into Japanese; defendants were represented by competent counsel who understood the English language which is the language of the court; no objection was raised during the trial to this procedure and no request made by defendants or their counsel to have the evidence interpreted to the Japanese in their own language. Held, no ground for a new trial. If the accused has counsel who understands the testimony either directly or through an interpreter, the constitutional requirement, Art. 6 of the Constitution, which says that an accused person has the right to meet the witnesses produced against him face to face, is complied with. *The King v. Ah Har*, 7 Haw. 319. The accused can waive the right to have the testimony, if in a language foreign to him, interpreted to him, when represented by counsel who understands the testimony either directly or through an interpreter, in capital cases as in those of a less degree.

Murder. Accessories before the fact. Conspiracy. Reasonable doubt.
/ Charge of the court to the jury given in full.
Verdict held not contrary to the evidence.

OPINION OF THE COURT BY WHITING, J.

These three defendants, Yamane Nenchiro, Osaki Mankichi and Ihara Ichigoro, together with Danjro Yahichi and Fugimoto Nehai, all Japanese, were indicted for the murder of Chew Foon Wing, a Chinese laborer, at Kahuku, Oahu, on the sugar plantation of the Kahuku Sugar Company on March 26, 1899. The trial was had at the May term, 1899, of the First Circuit Court at Honolulu, and a verdict was rendered finding Yamane guilty of manslaughter in the third degree, two jurors dissenting; Ihara guilty of murder in the first degree, two jurors dissenting; and Osaki guilty of manslaughter in the first degree, three jurors dissenting; Danjro and Fugimoto were found not guilty.

Prior to March 26th, 1899 (Sunday), ill feeling existed between the Japanese and Chinese laborers on the plantation, and, on Saturday, the day before the killing of Chew Foon Wing, a row occurred in which Fugimoto was assaulted by the Chinese, by one in particular who however was not known by name or number. (The laborers on the plantations under contract of ser-

vice have their contracts numbered and are often identified by their number rather than by name.) After this assault, a number of Japanese gathered together apparently to take means to obtain satisfaction, to speak mildly, to take it out of the Chinese, but were dissuaded by the plantation officials from then taking the law into their own hands. On Saturday night and Sunday morning and noon, the matter was discussed by the Japanese and concerted action agreed upon. Fugimoto and two others went from the Japanese quarters to the Chinese quarters to obtain satisfaction, money satisfaction, as was claimed for the assault on Fugimoto; a row occurred, and, on the calls of the three Japanese, all the Japanese, who were able, from the Japanese quarters ran to the Chinese quarters, getting weapons or arming themselves with sticks of firewood, sugar cane, iron bolts, a hammer, a hatchet, and a knife or two; they attacked the Chinese and the result was the death of three Chinese and the wounding of other Chinese.

The defendants moved to quash the indictment on the grounds:

1. "That the indictment has not been found or presented by a grand jury."

This point was submitted without argument, and in accordance with *Republic of Hawaii v. Edwards*, page 55, *ante* and *Republic of Hawaii v. Edwards*, 11 Haw. 571, is overruled.

2. "That the district magistrate by whom they were committed for trial did not keep or preserve any written detail of the minutes of the examination and proceedings held by him in reference to the charge against them, and did not note or preserve the substance of the testimony and facts upon which his decision in so committing them rested."

3. * * * * Abandoned and need not be stated.

4. "Said defendants also move that the second and fourth counts of said indictment be quashed on the ground that they or either of them have not been charged, examined or committed for trial upon any such charge or for any offense in said counts alleged or described."

5. * * * * Applies to Danjro, who was acquitted.

The procedure in criminal cases for commital is as follows: Penal Laws, Section 610. "In all cases of arrest for crimes, or misdemeanors cognizable before a jury, the magistrate in whose jurisdiction or on whose warrant the accused was arrested, shall, upon the appearance of the accused, proceed to consider whether there is probable cause to believe that a jury would, upon the evidence adduced, convict the accused of the offense with which he is charged, *he shall reduce to writing the substance of the evidence adduced, with the names of the witnesses*, and if in his opinion the testimony do not warrant commitment for trial, he shall release the prisoner, noting that fact upon his docket; but if in his opinion there is probable cause to believe that conviction would take .place before a jury, he shall make out and deliver to a constable a mittimus, which may be in the following form: ·

"To ——————— or any constable of the District of ——————— 'island of ——————— Hawaiian Islands.

"It appearing to my satisfaction that there is reason to believe ——————— who was arrested for ——————— on the information of ——————— (or otherwise as the case may be) would be convicted upon indictment for the said offense, (here follows a command to commit to jail for trial at the Circuit Court, &c.)

"In case of such commitment for trial, the committing magistrate shall forward without delay to the Attorney General a transcript of the evidence upon which the commitment is founded."

Penal Laws, Section 615. "In all cases of offenses against the laws of this republic, triable only by a court of record, the accused shall be arraigned and prosecuted by an indictment by a legal prosecutor of the republic, as soon after the commitment of the offense of which he is accused as may be expedient, provided always that the presentation of an indictment against an accused shall not be deferred beyond the term of the court having jurisdiction of the alleged offense next succeeding the commitment of the accused for trial by a magistrate having competent jurisdiction therefor."

Penal Laws, Section 616. The necessary bills of indictment shall be duly prepared by a legal prosecuting officer, and be duly presented to the presiding judge of the court before the arraignment of the accused, and such judge shall, after examination,

certify upon each bill of indictment whether he finds the same a true bill or not.

The Attorney-General is a legal prosecuting officer.

The charge made before the district magistrate was "that Yamane Nenchiro, Ihara Ichigoro, Osaki Mankichi, Danjro Yahichi and Fugimoto Nehai are charged with murder in the first degree at Kahuku, Island of Oahu, Republic of Hawaii, on the 26th day of March, A. D. 1899, for that they did at such time and place feloniously, willfully and with deliberate premeditated malice aforethought, and without authority, justification or extenuation by law, kill and murder one Chew Foon Wing, and did then and thereby commit the crime of murder in the first degree."

The district magistrate certifies "the court finds that there is probable cause to believe that a jury would convict the defendants upon the evidence adduced and commits them for trial before the Circuit Court of the First Judicial Circuit of the Hawaiian Islands, at its next term." And also certifies to a copy of the record together with the transcript of the evidence thereto attached as full, true and correct. The district magistrate also certifies that the notes of evidence are a "full, true and correct transcript of the evidence as per my record in the cases of the *Republic of Hawaii v. Yamane*" and the others named. This was sent to the Attorney-General.

At the hearing of the motion to quash "it was admitted by the Attorney-General that the clerk of the district court took down the substance of the evidence at the preliminary hearing and that the district judge himself did not, in his own hand, write the minutes; that the judge announced his decision and that the clerk took down the decision in his record."

The district magistrate issued a mittimus for each defendant, in the form prescribed by the statute including the charge of murder in the first degree as made before him as above set forth. The Attorney-General prepared the indictment and presented it to the circuit judge presiding at the May term of court, who certified it to be a true bill. The indictment contained four

counts, the substantial part of which necessary to be here set forth, omitting the usual formal parts, is as follows:

(First count). "Of their deliberate, premeditated malice aforethought did kill and murder one Chew Foon Wing, and did then and there and thereby commit the crime of murder in the first degree, contrary to the form of the statute in such case made and provided."

(Second count). "Of their malice aforethought, without authority, justification or extenuation by law, and *with extreme atrocity and cruelty* did kill and murder one Chew Foon Wing, and did then and there and thereby commit the crime of murder in the first degree."

(Third count). "Of their deliberate premeditated malice aforethought, and without authority, justification or extenuation by law, did make an assault with knives, hoes, clubs, sticks, stones and other weapons to the Attorney-General unknown, and did then and there feloniously, willfully and of their deliberate premeditated malice aforethought, without authority, justification or extenuation by law, strike, cut, beat and bruise the said Chew Foon Wing, then and there and thereby giving to the said Chew Foon Wing certain mortal wounds of which said mortal wounds he, the said Chew Foon Wing, on the same day died, and that so the said Yamane Nenchiro, Ihara Ichigoro, Osaki Mankichi, Danjro Yahichi and Fugimoto Nehai at the time and place aforesaid, and in the manner and form aforesaid, did kill and murder the said Chew Foon Wing, and then and there and thereby did commit the crime of murder in the first degree."

(Fourth count). "With force and arms in and upon one Chew Foon Wing, feloniously, willfully and of their malice aforethought, and without authority, justification or extenuation by law, *and with extreme atrocity and cruelty* did make an assault with knives, hoes, clubs, sticks, stones and other weapons to the Attorney-General unknown, and did then and there feloniously, willfully and of their malice aforethought, without authority, justification or extenuation by law, and with extreme atrocity and cruelty, strike, cut, beat and bruise the said Chew Foon Wing, then and there and thereby giving the said Chew Foon Wing mortal wounds, of which said mortal wounds, he, the said Chew Foon Wing, on the same day, died. And so the said Yamane Nenchiro, Ihara Ichigoro, Osaki Mankichi, Danjro Yahichi and Fugimoto Nehai at the time and place aforesaid,

and in the manner and form aforesaid did kill and murder Chew Foon Wing and then and there did commit the crime of murder in the first degree."

In considering the second question raised in the motion to quash, as to the recording of the testimony in the district court by the clerk, it is contended that the district magistrate failed to comply with the provision of Section 610 of the Penal Laws, that "he shall reduce in writing the substance of the evidence adduced;" that the clerk has no authority to perform the duties which the statutes require to be done by the magistrate; that if the legislature intended that the magistrate should himself record the testimony, no plainer or more distinct language would ordinarily have been used; that the use of *he* and *his* in the statute refer to the *magistrate* and nobody else; that if the legislature had intended that the testimony might be recorded by a clerk the testimony must be reduced to writing by the magistrate "or under his direction;" or if the Hawaiian legislature had intended or other assistant of the magistrate, it would have been provided for in some such language as that used by the California legislature in Section 869 of their Penal Code, which provides that to confer upon clerks of district courts the authority to record the testimony, express authority would have been conferred as in the case of clerks of courts of record, Civil Laws, Section 1182. ("A clerk shall attend and record the proceedings of all sittings of courts of record and in proceedings before a circuit judge in chambers shall, if there be no official reporter in attendance, record the oral evidence adduced when so required by the judge.") "That recording of the substance of the testimony is not a mere mechanical duty, but one that requires the exercise of judgment and therefore a judicial duty which cannot be delegated; that if a clerk or substitute is to record the substance of the testimony, then the chances are that the record will not show the facts on which the magistrate really based his decision."

Section 610, Penal Laws of 1897, Session Laws 1892, Chapter 57, Section 22, providing for the duty of the magistrate in criminal cases, has been quoted *supra*. In civil cases a similar

duty is required of the magistrate, Section 1121, Civil Laws, 1897, Session Laws 1892, Chapter 57, section 13; "The district magistrate shall in all cases preserve in written detail the minutes and proceedings of their trials, transactions and judgments, with substance of the testimony and the facts upon which their decisions rest."

The district court is not a court of record. Act 8, Session Laws, 1898, authorizes the appointment of a clerk for the district court of Honolulu, but does not define or prescribe the duties of such clerk.

We cannot agree with the contention of counsel for defendant that the legislature intended that the magistrate himself should write down the substance of the testimony. To so hold would make the taking down of the testimony in that manner a matter affecting the jurisdiction of the circuit court in finding the bill of indictment, in allowing the information. The defect is not jurisdictional, and it is sufficient if the substance of the testimony be preserved by the district magistrate and authentically reduced to writing under his direction. The district magistrate adopted and certified to the transcript of the testimony as his own, it having been given before him and in his presence taken down. The spirit of the law is complied with. The object of the preliminary examination is to ascertain whether the crime charged has been committed, and if so whether there is probable cause to believe that a jury would convict the defendants upon the evidence adduced. And, further, that the prosecuting attorney may have something to guide him in determining the character of the offense he will charge against the prisoner in the information. And incidentally to furnish minutes of the testimony to refresh the memory of witnesses or to furnish grounds in proper cases to impeach the testimony of witnesses, but these latter purposes may be accomplished by other means than the notes of the magistrate.

To hear and determine the evidence and facts, which constitute the offense for which the accused is committed for trial, are the judicial functions. It is not essential that the testimony

at the preliminary examination of a person accused· of crime should be taken down by the hands of the judge himself. It suffices if it be done under his supervision and direction. *State v. Wiggins,* 50 La. Ann., 23 S. R. 334.

Under a statute, Sec. 7, Chap. 107 of the Laws of 1897, State of Kansas, creating two city courts in Kansas City, which provides that "in all preliminary examinations held before said judges in cases of persons accused of the commission of a felony, it shall be the duty of said clerks to take down all the testimony in writing and file the same with the papers in the case," the clerk took down the testimony in shorthand but failed to write .out the evidence in long hand and file the same in a case of larceny. It was held that the failure of the clerk to take down the testimony given in a preliminary examination of a person charged with a felony, and file it with the papers in the case, does not defeat the jurisdiction of the district court to try him on an information based on such preliminary examination and a finding of the city judge of probable cause for believing the accused guilty of the offense charged. It can hardly be presumed that the legislature intended to make the performance of this duty a jurisdictional matter in preliminary examinations before the city courts. *State v. Flowers,* 58 Kan. 702; 50 Pac. Rep. 938.

The fourth ground of the motion to quash: "The motion to quash the second and fourth counts of the indictment on the ground that they or either of them have not been charged, examined or committed for trial on any such charge or for any such offense in said counts alleged or described." This raises the question whether the crime therein charged is the same as that named in the commitment, or is necessarily included within the charge of murder in the first degree, as charged in the commitment.

In the case of the *People v. Christian,* 101 Cal. 471, the defendant was charged with assault with a deadly weapon upon one George Magin and was held to answer therefor by the committing magistrate. The district attorney filed an information

charging him with such an assault upon one George *"Massino."*
It was held that the information must be set aside, he being
committed for trial for an assault on one *"Magin."* The court,
after stating the facts showing that defendant had been brought
before the magistrate to defend himself against a charge of
assaulting one *Magin*, says: "Under those circumstances, and
under a complaint charging that offense, he would not be called
upon to defend himself for assaulting one Massino, for there
was no complaint on file upon which to base an examination
of that character." And after reviewing the cases upon the
subject, it is said, "It may be laid down as an unquestioned pro-
position that the district attorney has no authority to disregard
the commitment, and cull from the evidence taken at the prelim-
inary examination some real or imaginary offense, not included
in the complaint, upon which the defendant was charged or
examined; the district attorney is only required to file the in-
formation for some offense included in the allegations of the
complaint, but the magistrate likewise only has the power to
commit for some offense included therein."

The court, in *People v. Howard*, 111 Cal. 660, says in com-
menting on the above case of *People v. Christian*, "The prin-
ciples to be deduced from this case are that the complaint lodged
with the magistrate constituted the ground work of the whole
superstructure to be thereafter built thereon, and draws the line
which must circumscribe the limits the prosecution can take.
The defendant in other words may be competently informed
against and tried for any offense charged in the complaint or
included therein, but, beyond that limitation the prosecution
cannot·go." * * * As remarked in *People v. Christian*,
*supra*, "If such were not the true rule the whole procedure
after preliminary examination would be absurd, and as to the
defendant a mockery. Where defendant is brought before a
magistrate charged with having committed a public offense, he
must be informed of the charge against him, and advised as to
his right to the aid of counsel in every stage of the proceedings.
(He is·.entitled to a certain .time to prepare his defense. The

provisions of the statute clearly contemplate that he shall be required to defend himself against the crime *with which he is charged,* and no other crime. He has not been notified of any other charge, and, consequently, is not prepared to defend himself against another charge." "There is no provision of the statute by which a defendant may take advantage of the admission of immaterial or incompetent evidence by the magistrate. Hence, all manner of crimes may be proven against him, and thus the district attorney would have the privilege of selecting the most heinous on which to frame his information. Such is not the law, and, whenever a defendant is informed against for an offense different from that charged in the complaint upon which he was examined, or not included therein, he has had no examination for that offense, and is entitled to have the information set aside upon the ground that he has not been legally committed."

See *People v. Wallace,* 94 Cal. 501; *People v. Giancole,* 74 Cal. 646; *Yancr v. People,* 12 Michigan, 286. (In this case the statutes of Michigan are set forth.) *People v. Jones,* 24 Mich., 214; *State v. Boulter,* (Wyoming) 39 Pac. R. 883.

In the *People v. Annis,* 13 Mich., 511, the Court says: "The statute provides that, except in specified cases, no information shall be filed against any person for any offense until such person shall have had a preliminary examination therefor, before an examining officer or magistrate, unless such person shall waive his right to such examination. The examination was designed to some extent to accomplish the presentment of a grand jury in protecting a party against being subject to the indignity of a public trial for an offense before probable cause had been established against him by evidence under oath. But, it was never designed that the complaint or warrant before the magistrate should stand in the place of a formal presentment, or that in the circuit court the prosecuting officer should be limited by it in the mode of charging the offense. It is undoubtedly competent for him, so long as he does not undertake to proceed against a person for a different transaction than that to which the examina-

tion relates, to put his information in such form as, in his opinion, will enable him to try the offense on its merits in the way most effectually to advance the ends of justice.

A preliminary examination is required for the purpose of giving to the defendant a reasonable notice of the nature and charge of the offense charged against him. "All that is necessary is that the defendant should be given a fair opportunity to know by a proffered preliminary examination the general character and outlines of the offense against him, and it is not necessary that all of the details and technical averments required in an information should be set forth in the papers used on the preliminary examination." In *State v Spalding*, 24 Kan. 4, Mr. Justice Brewer, speaking for the court, said: "It will be remembered that those preliminary proceedings are generally had before justices of the peace, officers not learned in the law, and if the same fullness and precision, the same precaution against all the contingencies of the testimony were required there as in the information or indictment, justice would be often delayed and defeated. All that can be required is that there shall be a single statement containing the substantial facts of the offense charged, and then the prosecutor, in preparing the information, may use many counts varying in them the formal and non-essential matters of the crime. He may not add a new offense. To larceny he may not add robbery, nor murder, nor arson. Neither may he add the larceny of one piece of property to the larceny of another. He may not substitute one offense for another; but, he may, by several counts, guard against the contingencies of the testimony." *State v. Jarrett,* 46 Kan. 756; S. C. 27 P. R. 146.

In *Republic of Hawaii v. Tsunikichi*, 11 Haw. 341, the indictment contained several counts, one charging the killing "with deliberate premeditated malice aforethought," and another charging the "killing with extreme atrocity or cruelty," the defendant moved that the prosecution elect upon which count or counts of the indictment they could go to trial and ask for a conviction. The trial court refused. The court held, "This was

not error, the different counts merely charge the same offense in different ways—this is proper in order to adapt the pleadings to the different aspects in which the evidence on the trial may present a single transaction." *Bish. New Crim. Prac.* Sec. 457 n.; *Comm. v. Webster,* 5 Cush. 295.

Although the question raised in the above case was not based on the same facts as in the case at bar, (an examination of the records, not reported therein, show that the defendant was committed for murder on both charges with "deliberate premeditated malice aforethought" and "with extreme atrocity or cruelty") yet, the case of Tsunikichi is decisive that the counts charge the same offense in different ways, and that being so the exception must be overruled as "being included within the crime for which the accused was committed for trial." Our statute does not create distinct offenses of murder in the first degree, but one offense, one crime, which may be committed by any of the means described in the statute which, if proven, constitute the same felony. It is the same transaction.

In considering the remaining exceptions we deem it advisable to insert in full the charge given by Perry, J., to the jury.

CHARGE OF THE COURT. "Gentlemen:—If my charge to you shall prove somewhat lengthy, you will bear with me, remembering that there are many important issues to be decided on which the lives and liberty of these defendants depend.

The charge against these defendants as stated in two of the counts of the indictment, is that they did, at Kahuku, on this island, on the 26th day of March last, with deliberate, premeditated malice aforethought, and without authority, justification or extenuation by law, kill and murder one Chew Foon Wing.

The charge against them, as stated in the other two counts of the indictment, is that they did, at the said time and place, with malice aforethought and with extreme atrocity and cruelty, and without authority, justification or extenuation by law, kill and murder said Chew Foon Wing.

Our statute defines murder as follows: "Murder is the killing of any human being with malice aforethought, without authority, justification or extenuation by law, and is of two degrees, the first and second, which shall be found by the jury.

"Murder committed with deliberate, premeditated malice aforethought, or in the commission or attempt to commit any crime punishable with death, or committed with extreme atrocity or cruelty is murder in the first degree.

"Murder not appearing to be in the first degree, is murder in the second degree."

I will say at this point that I shall define certain terms during the course of my charge and if thereafter I shall use those terms I shall intend and want to have them understood with the meaning that I give to them in the early part of the charge.

Malice in respect to the commission of an offense includes not only hatred, ill-will, and desire of revenge, but cruelty of disposition or temper, and also a motive or desire of doing a wrong or injury to any person or persons. It also includes the acting with a heedless, reckless disregard, or gross negligence of the life or lives, the health or personal safety of another.

Our statute also provides that every one shall be presumed to intend the natural and plainly probable consequences of his acts, and further, that when the act of killing another is proved, malice aforethought shall be presumed, and the burden shall rest upon the party who committed the killing to show that it did not exist or a legal jurisdiction or extenuation therefor.

And so in this case, if you believe from the evidence that the defendants or any one or more of them committed the killing of Chew Foon Wing, either as principals or as accessories before the fact, within the meaning of the law on this subject as I shall hereafter state it to you, then malice aforethought on the part of such one or more of the defendants as you find so committed the killing is to be presumed by you and the burden is on such one or more of the defendants to show that such malice did not exist, or a legal justification or extenuation for the killing.

"Premeditated" means, thought of beforehand, for any length of time however short. There is premeditated malice where the intention to unlawfully take life, or to unlawfully commit such an assault upon another that from it the taking of life would result as a natural and plainly probable consequence, is deliberately formed in the mind, and that determination meditated upon before the fatal deed is done. There need be no appreciable space of time between the formation of such intention and the killing. They may be as instantaneous as successive thoughts. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation and premeditation.

"Deliberately" means in a cool state of the blood, that is, not in the heat of passion.

The term "deliberate" does not so much import an act done after time for reflection, as a voluntary act, an act upon motive, purpose and design, in contradistinction to acts done in the heat of passion, where reason and choice for the moment have no power or sway.

The law fixes no limit of time, if the person has actually formed the purpose deliberately and maliciously to kill or to commit such an assault upon another that from it the taking of life would result as a natural and plainly probable consequence, and has deliberated and meditated upon it before he performs the act, he is guilty of murder in the first degree, however short the time may have been between the purpose and the time of its execution.

Murder in the second degree differs from murder in the first degree, in that, while the killing is committed with malice afore-thought, the elements of deliberateness and premeditation are lacking. If the killing is committed, not in a cool state of the blood, but in the heat of passion which was caused by *inadequate* provocation, then the offense is murder in the second degree and not in the first degree.

Manslaughter consists in the killing of a human being with-out malice aforethought, and without authority, justification or extenuation by law, and is of three degrees, the first, second and third.

Our statute says "Whoever is guilty of manslaughter in the first degree shall be punishable by imprisonment at hard labor for a term of years not less than ten, nor more than twenty, in the discretion of the court."

"Whoever is guilty of manslaughter in the second degree shall be punished by imprisonment at hard labor not more than ten years nor less than five years."

"Whoever is guilty of manslaughter in the third degree shall be punished by imprisonment at hard labor, not more than five years, or by a fine not more than one thousand dollars, in the discretion of the court."

Under an indictment for murder in the first degree, such as in this case, a verdict may be returned either of murder in the first degree, or of murder in the second degree, or of man-slaughter in any one of the three degrees, according as the facts proved will warrant, and in accordance with the instructions as to the law which are given by the court.

The difference between murder and manslaughter is that the one has in it the element of malice aforethought and the other has not. A homicide committed under the influence of passion or in the heat of blood produced by an *adequate* or *reasonable* provocation is manslaughter and not murder.

If one sees another being actually assaulted and goes to his rescue, he may use such force as may be reasonably necessary to put an end to the assault and protect the assaulted person, but not more, and if, while thus reasonably acting while defending the other, heat of passion is produced in him by the conflict, and in such heat of passion, and without malice, he kills the assailant, such heat of passion is caused by an *adequate* provocation and the killing is manslaughter and not murder. On the other hand, if one, running to the rescue of another in response to cries for help, meets such other already escaping at a safe distance and free from danger, yet, in the heat of passion caused by thought of the recent assault on the escaping, at once attacks the assailant of such other, without deliberateness and without premeditation, and death ensues, such heat of passion is caused by *inadequate* provocation, and the offense is murder in the second degree and not manslaughter.

But if the determination to kill or inflict serious bodily injury is formed deliberately and with premeditation, then, even if heat of passion is engendered while in the execution of the design and the killing occurs while in such heat of passion, that cannot avail to reduce the offense to either manslaughter or murder in the second degree, and the offense is nevertheless murder in the first degree.

There are two matters in this case which have been proved by undisputed evidence, and those, I charge you, you must find as facts. They are these: First, that Chew Foon Wing, a Chinese, died at Kahuku, on this island, on Sunday the 26th of March last, and second, that his death was caused by violence dealt him on the afternoon of that day by one or more other persons. Who the person was, or who the persons were, who dealt such violence upon the deceased, or what weapon or weapons, if any, were used in the assault, or what the circumstances were under which the assault was committed, all these I leave to you to determine upon the evidence.

Before proceeding further, I shall make a statement to you of what the law is on the subject of principals and accessories before the fact.

All who take part in the commission of an offense, or, being

present, aid, incite, countenance or encourage others in the commission thereof, are principals therein, even though they may not have previously conspired to bring it about. The mere presence of a party at the commission of an offense, however much he may sympathize with the perpetrators of such offense, or his mere failure to interfere and endeavor to prevent its commission, is not sufficient to constitute him a principal; there must be something shown in his conduct which unmistakably evinces a design to encourage, incite, approve or in some other manner offer aid or consent to the act.

Any person who, not himself being present at the commission of an offense, abets another in the commission thereof, or procures, counsels, incites or commands another to commit the same, which such other thereupon, in pursuance thereof, commits, is an accessory before the fact to the commission of such offense.

The mere knowledge and concealment of the fact that a person or persons intend to commit an offense, or even the bare permission to commit an offense, is not of itself enough to make the person who possess such knowledge, or who gives such permission, an accessory before the fact. It is necessary that he should say or do something affirmatively to encourage its commission. But, if one assists in the formation of a plan to kill another or to commit such an assault upon him that from it the death of such other would result as a natural and plainly probable consequence, or if, being informed of the existence of such a plan, he counsels, advises or encourages the carrying out of such plan or assists in the devising ways and means for the accomplishment thereof, and if in pursuance of such plans, or in consequence of such advice, counsel or encouragement, an offense is committed, then the one who so assists in the formation of such plan, or who advises, counsels or encourages its execution, is guilty of being an accessory before the fact to the commission of that offense.

Our statute provides that every person who, being present, aids in the commission of an offense, or who, not being present, is accessory before the fact thereto, is guilty of such offense, and shall be subject to punishment therefor, in the same manner and to the same effect as if he had been present at the commission thereof, and actually taken part therein. And so in this case these defendants, though charged in the indictment with themselves doing the killing, may be tried and either convicted or acquitted not only upon the charge of doing the actual killing themselves, but also upon the charge of being present and aiding or encouraging others in doing the killing, and upon the further charge of

counselling, advising and encouraging others to do the killing while not present themselves at the killing.

Closely connected with the subject of accessories before the fact, and being really a part of it, is that of conspiracy.

A conspiracy may be described, in general terms, as a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful, by criminal or unlawful means.

As soon as the union of wills for the unlawful purpose is perfected the conspiracy is complete. This joint assent of the minds, like all other parts of a criminal case, may be established as an inference from the other facts proven, in other words, by circumstantial evidence.

Though the common design is the essence of the conspiracy, it is not necessary to prove that the alleged conspirators came together and actually agreed, in terms, to have that design, and to pursue it by common means. If it be proved that they pursued by their acts the same object, often by the same means, one performing one part, another performing another part of the same, so as to complete it, with a view to the attainment of that same object, the conclusion will be justified, if the jury so believes from the evidence, that they were engaged in a conspiracy to effect that object.

But, from the mere proof of these facts which I have just mentioned, the jury while it *may* do so, is not *obliged* to draw the conclusion or inference that the parties were engaged in a conspiracy to effect that object; you may still infer or conclude, if you so believe from the evidence, that there was no conspiracy and that the acts of the parties were entirely disconnected, and not in pursuance of a common design, in short, it is always for the jury, upon the proofs of such facts to draw therefrom such inferences and such conclusions as they may believe to be proper and to say what they believe the truth to be.

A conspiracy to kill another person or to commit an unjustifiable assault upon another person or class of persons, is a conspiracy for an unlawful purpose.

It is not necessary to prove that the conspiracy originated with those who are particularly charged, or that they met during the process of its concoction; for every person entering into a conspiracy or common design, already formed, is deemed in law a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design.

It makes no difference in the degree of responsibility resting upon those conspiring to do an unlawful act, that some of them were not present at the consummation of the design of the conspiracy. Where persons combine to stand by one another in a breach of the peace, with a general resolution to resist all opposers, and, in the execution of their design, a murder is committed, all of the company are equally principals in the murder, though at the time of the act some of them were at such a distance as to be out of view, if the murder be in furtherance of the common design.

He who enters into a combination or conspiracy to do such an unlawful act as will probably result in the taking of human life, as, for example, the infliction of grevious bodily injury, must be presumed to have understood the consequences which might reasonably be expected to flow from carrying it into effect, and also to have assented to the doing of whatever would reasonably or probably be necessary to accomplish the objects of the conspiracy even to the taking of life.

Where there is a conspiracy to accomplish an unlawful purpose, and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any co-conspirator in the accomplishment of the purpose in which they are all at the time engaged.

Where a conspiracy is formed to kill or to inflict grevious bodily injury upon a body or class of men, as, for instance, Chinese laborers on a certain plantation, then, if the body or class of men to be attacked is clearly understood and designated by and among the conspirators, and if one of such class is killed in pursuance of such conspiracy, the guilt of all the members of such conspiracy is the same as though a person having a particular name had been pointed out as the victim.

At this point I shall give you certain of the instructions requested by the defendants and also certain of those requested by the prosecution.

An individual who, though not specifically party to the killing, is present and consenting to the assemblage by whom it is perpetrated, is a principal when the killing is in pursuance of a common design; but mere presence alone is not sufficient to justify the conclusion that he assented to its commission, and his assent must be proven before he can be convicted of aiding, abetting, inciting or encouraging.

If in the execution of a common design one of the parties thereto turn aside and commit a felony foreign to the original

design, his companions do not participate in his guilt and are not responsible for the felony so committed, unless at the time of the commission of the felony they are present aiding, inciting, countenancing or encouraging its commission.

In order to convict the defendants or either of them of murder in the first or second degree, you must be satisfied beyond a reasonable doubt, that the defendants, or such of them as you may convict, gave to Chew Foon Wing the fatal blow or blows either actually or constructively, or that they were parties to a common design having for its object the killing of Chew Foon Wing or the Chinese there in general, or the infliction upon him or them of great bodily harm, it not being necessary however, to show malice against Chew Foon Wing in particular if it is shown to have existed against the Chinese in general.

If the common design was merely to do unlawful violence less than grievous bodily harm, to the Chinese at Kahuku in general or to the deceased in particular, and in pursuance of that design Chew Foon Wing was killed, the parties to that design who were not present at such killing, aiding, inciting, or encouraging its commission with malice aforethought, would be guilty of manslaughter but not of murder.

If you are not satisfied from the evidence beyond a reasonable doubt that the defendants or any of them actually killed Chew Foon Wing, or were present, aiding, abetting, inciting, countenancing or encouraging the killing, or were not intentionally parties to a common design have for its object the killing of Chew Foon Wing or the infliction of great bodily harm on him in particular, or upon the Chinese as a class in general, you should render a verdict of not guilty.

If you believe that there was a common design among some of the Japanese at Kahuku to commit murder or to do unlawful violence in pursuance of which the deceased was killed, but are not satisfied beyond a reasonable doubt that these defendants or any of them were parties to the execution of that design, or were parties to the design and continued as such up to the time of its execution, they cannot be held responsible for its consequences.

If you believe that one or more of these defendants went to the Chinese camp to render assistance to persons in peril, or went there out of curiosity to see what was taking place there, and without any unlawful intention, he or they should be acquitted unless you are satisfied beyond a reasonable doubt that he or they killed Chew Foon Wing or were present at his killing, aiding, abetting, inciting or encouraging the killing, in which latter case

you must convict such one or more of the defendants of either manslaughter or murder as the case may be, according to my instructions.

In regard to Danjro I charge you that there is no evidence showing that he either killed the deceased himself or was present when the fatal blow was given. You therefore cannot convict him of any offense under this indictment unless you are convinced beyond a reasonable doubt that he was a party to a common design to kill or do grevious bodily harm either to Chew Foon Wing in particular or to the Chinese at the camp in general, in which case he would be guilty of murder, or that he was party to a common design to do mere unlawful violence less than grevious bodily harm, in which case he would be guilty of manslaughter. If you are not so convinced you should find him not. guilty.

The evidence of statements and conversations had by Ihara in the absence of the other defendants are evidence against Ihara only and not against the other defendants. So also the evidence of statements made by Danjro is evidence against Danjro only.

The defendants as I have already intimated are also charged with the crime of murder in the first degree by killing Chew Foon Wing with extreme atrocity and cruelty, without authority, justification or extenuation by law. While presumptions of malice are necessarily presumptions of murder, because all malicious killing is murder, they are not presumptions of murder in the first degree and such presumptions justify conviction in the second degree only, unless the weapons used or the means used, or the other facts and circumstances surrounding the killing and connected with it show that the killing was in fact with deliberate, premeditated malice, or with extreme atrocity or cruelty. Deliberate, premeditated malice, or else extreme atrocity or cruelty must be proved by the evidence in order to justify a verdict of murder in the first degree. It is not necessary in order to convict the defendants of the murder of Chew Foon Wing with extreme atrocity or with extreme cruelty to prove that the weapons used in committing the murder were, or that the manner of committing it was, the most atrocious or the most cruel possible; but the crime must have been committed with atrocity or with cruelty of a higher degree than is usually incident to murder.

If the evidence satisfied you beyond a reasonable doubt that the defendants or any of them without authority, justification or extenuation by law killed Chew Foon Wing with deliberate premeditated malice aforethought, or killed him with extreme

atrocity, or killed him with extreme cruelty, it is your duty to find such defendants guilty of murder in the first degree.

It is not necessary in order to constitute murder in the first degree that the defendants or any one or more of them should have struck a fatal blow, or even have touched Chew Foon Wing, or have attempted to touch him. If the evidence shows beyond a reasonable doubt that Chew Foon Wing was in fact murdered with deliberate premeditated malice aforethought, directed either against him individually or against the Chinese camp, or the members of that camp of which he was a member, or if he was in fact murdered with extreme atrocity or with extreme cruelty, and that the defendants or any of them were present and aided, incited, countenanced or encouraged others in the commission of the murder, then you must find such defendants guilty of murder in the first degree.

If the evidence shows beyond a reasonable doubt that the defendants or any of them without authority, justification or extenuation by law, and without deliberate premeditation, and without extreme atrocity and without extreme cruelty, but with malice aforethought, killed Chew Foon Wing, then you must find such defendants guilty of murder in the second degree.

In the case of murder in the second degree, as in the case of murder in the first degree, it is not necessary to constitute the crime on the part of these defendants or any one or more of them that they should have struck the fatal blow or even have touched Chew Foon Wing, or have attempted to touch him. If the evidence shows beyond a reasonable doubt that Chew Foon Wing was in fact murdered under such circumstances as constitute murder in the second degree, and that these defendants or any of them were present and aided, incited, countenanced or encouraged others in the commission of the murder, then you must find such defendants guilty of murder in the second degree.

The malice aforethought essential to murder in the second degree, the same as the deliberate, premeditated malice aforethought essential to murder in the first degree need not have been directed against Chew Foon Wing in particular as distinguished from the members of the Chinese camp in general. If the evidence shows beyond a reasonable doubt that the defendants or any of them killed Chew Foon Wing without authority, justification or extenuation by law, and without malice aforethought, such defendants are guilty of manslaughter.

And again, in the case of manslaughter as in the case of murder in either degree, it is not necessary to constitute the crime on

the part of these defendants or any one or more of them that they should have struck the fatal blow or even have touched Chew Foon Wing or have attempted to touch him. If the evidence shows beyond a reasonable doubt that Chew Foon Wing was unlawfully killed and that these defendants or any of them were present and aided, incited, countenanced or encouraged others in the unlawful killing, then under our law you must find such defendants equally guilty as if they themselves had struck the fatal blow.

To summarize now, in somewhat different form perhaps, and in order to render it certain that no possible phase of this case is left untouched, I give you the following further instructions:

If you believe from the evidence that no conspiracy to which any of the defendants were parties was formed at any time prior to the assault on Chew Foon Wing which resulted in his death, having for its object the killing of Chew Foon Wing or an assault upon Chew Foon Wing in particular, or on the members of the Chinese camp to which he belonged in general, and that none of the defendants participated in the assault on Chew Foon Wing, and that none of them being present aided, incited, countenanced or encouraged its commission; or, if the evidence does not satisfy you beyond a reasonable doubt of any of these facts, then you must find all of the defendants not guilty. And, if the evidence does not satisfy you beyond a reasonable doubt of any of these facts as to one or more of the defendants, but does so satisfy you as to the others then you must find all of such defendants not guilty as to whom the evidence is, in your opinion, insufficient.

If the defendants went to the Chinese camp to rescue certain of their fellow countrymen in great bodily peril of life or limb from an unjustifiable attack on the part of the Chinese, and if the defendants used no more force than was reasonably necessary to save the lives or limbs or bodily health of their fellow country-men, in peril as aforesaid, and if the defendant did not aid, incite, countenance or encourage others in using more force than was reasonably necessary to save the lives or limbs or bodily health of their fellow countrymen from an unjustifiable attack seriously endangering life or limb, then, if you find that such were the facts, you must find the defendants not guilty.

If you believe from the evidence that in such last mentioned case, that is, a going to the rescue of their fellow countrymen while the latter were in great bodily peril of life or limb, the defendants or some of them, used, or aided, incited, countenanced or encouraged the use of more force than was reasonably neces-

sary to save their countrymen, and that the death of Chew Foon Wing resulted from such force so used, but if you also believe that such excess of force was used, or aid or encouragement thereto given, while such defendants were in the heat of passion caused by an attack on their countrymen, and was not used with malice aforethought, then such heat of passion was caused by an *adequate* provocation, and you must find such defendants so using or encouraging an excess of force guilty of manslaughter, and fix the degree in accordance with your estimate of the facts proven.

If you believe from the evidence that prior to the assault on Chew Foon Wing there was no conspiracy to which any of the defendants were parties to kill or inflict grevious bodily harm upon Chew Foon Wing in particular or upon the members of the Chinese camp in general, and that the defendants or some of them, on hearing calls for help from some of their countrymen ran to their assistance towards the Chinese camp, but that on the way they met all of their said countrymen who had been assaulted, escaping at a safe distance, and beyond all danger of life or limb from any attack by the Chinese, and none of their countrymen in peril, and that in the heat of passion caused by the thought of the recent assault on those so escaping, such defendants at once attacked the Chinese, or aided or encouraged such attack, without deliberation or premeditation, and that Chew Foon Wing was killed in such attack, then such heat of passion was caused by *inadequate* provocation and you must find such of the defendants as thus participated in, or aided, incited or encouraged, or countenanced the killing of Chew Foon Wing, guilty of murder in the second degree.

But, if, in this last mentioned case, that is, a running to the rescue in response to cries for help, and meeting their fugitive countrymen entirely out of danger, such an occurrence was used by the defendants or any of them, solely as a pretext for wreaking their vengeance upon the Chinese, and if such defendants did thereupon, with deliberate, premeditated malice aforethought, or with extreme atrocity, or with extreme cruelty, assault and kill Chew Foon Wing, or if being present, they aided, incited, encouraged or countenanced such killing with deliberate, premeditated malice aforethought, or with extreme atrocity, or with extreme cruelty then you must find such defendants guilty of murder in the first degree.

And so also, if you believe from the evidence that prior to the assault on Chew Foon Wing, which resulted in his death, a conspiracy was formed to which the defendants or one or more of

them were parties, having for its object an attack upon the Chinese at their camp, of which body Chew Foon Wing was one, and the doing of grevious bodily harm to Chew Foon Wing in particular, or to the Chinese in such camp in general, or the killing of one or more of them, and that in pursuance of such conspiracy, such attack was made, and that Chew Foon Wing was killed by one or more of the members of such conspiracy, whether defendants themselves or others, during such attack, and that the members of such conspiracy acted, and that the assault was made with deliberate, premeditated malice aforethought, and without authority, justification or extenuation by law, then you must find all of such defendants who so entered into such conspiracy, and who continued in it until the killing, guilty of murder in the first degree, whether they were actually present at the killing of Chew Foon Wing or not.

Again, even if you find there was no conspiracy prior to the assault on Chew Foon Wing which resulted in his death, still, if you believe from the evidence that some one or more of the defendants with deliberate, premeditated malice aforethought, or with malice aforethought, and with extreme atrocity or cruelty, and without authority, justification or extenuation by law, committed the killing of Chew Foon Wing, or participated therein, or being present aided, incited, countenanced or encouraged such killing, or rather, aided, incited, countenanced or encouraged one of themselves, that is, the defendants, or some one other than the defendants, to commit such killing, in such case also you must find such of the defendants as aforesaid guilty of murder in the first degree.

The indictment as has been already stated, charges the defendants with the murder of Chew Foon Wing, and not of anyone else. They are not on trial for the murder of anyone else. The evidence which has been admitted tending to show the killing of two other Chinese, and the assaulting and wounding of several others, has been admitted and is to be considered by you solely in so far as it tends to throw light on the question of whether or not there was a conspiracy to attack the Chinese in general or Chew Foon Wing in particular, and on the question of whether or not the defendants or any of them were present at the assault on Chew Foon Wing, aiding, inciting, countenancing and encouraging such assault, and also on the question of malice or lack of malice either against Chew Foon Wing in particular or against the Chinese and the camp in general. At the same time you must bear in mind the instructions which I have already given you on

the subject of principals and accessories and conspiracy; and if the evidence satisfies you beyond a reasonable doubt that they, the defendants, or any one of them, participated in a preconcerted general attack on the Chinese camp, or if it has satisfied you beyond a reasonable doubt that they or any of them, being present, aided, incited, countenanced or encouraged others to make such attack, and that in such attack Chew Foon Wing together with others were unlawfully killed, then you must convict such one or more of the defendants of homicide, that is, of murder in the first degree, or in the second degree, or of manslaughter in any one of the three degrees, according as the facts proved may warrant under my instructions. Otherwise you must acquit them.

Each defendant stands by himself and should be convicted of murder in the first degree, or of murder in the second degree, or of manslaughter in the first, second or third degree, or should be acquitted, according to the character and conclusiveness of the evidence against him or the want of it, or the evidence in his behalf. You can, in the discharge of your duty, find some of the defendants guilty of homicide in any degree, and others not guilty bearing in mind that the verdict must be according to the law as I have given it to you, and the facts as you find them from the evidence.

The law makes you the sole judges of the facts and forbids me to comment upon the character, quality, strength, weakness or credibility of any evidence in the case, or upon the character, attitude, appearance, motive, or reliability of any witness.

The questions of the existence or non-existence of malice, of the existence or non-existence of the heat of passion, of what the provocation was for such heat of passion, if any, of the existence or non-existence of deliberateness or premeditation, of whether or not there was a conspiracy, of what that conspiracy, if any, was, of what part the defendants and each of them, took in the disturbance at Kahuku, and what all the other facts and circumstances of the case are, all of these matters are for you, and for you alone, to consider and determine upon the evidence adduced before you.

Bear in mind that all that you have heard or read outside of this court room must be absolutely disregarded by you as must also all improper feelings and prejudices, if you have any, be laid aside. Your verdict must be based solely upon the evidence produced here in court, and upon the law as I have stated it to you.

Of the weight of the evidence and of the credibility of the witnesses who have testified you alone are the judge, and in de-

termining these matters you must consider the character, attitude, appearance, motive and reliability of the witnesses; also their actions and manner of testifying, and the circumstances that attach to and surround the witness; the consistency or inconsistency of their statements; also their probability or improbability, and the witness' interest or lack of interest in the case.

The fact that Ihara did not take the stand to testify must not be taken by you as being against him. No inference prejudicial to him is to be made by you from such failure.

Each and every one of these defendants is presumed to be innocent until the contrary is shown, and the burden is upon the prosecution to prove their guilt beyond a reasonable doubt.

If upon all the evidence, viewed in the light of the instructions I have given you, you have a reasonable doubt as to the guilt of any one or more of the defendants or any offense charged, then as to such defendants your verdict will be, not guilty. If you have a reasonable doubt of the guilt of any one or more of the defendants of a higher degree of the offense, but have no such reasonable doubt of his guilt of the next lower degree of the offense, then you must find him guilty only of such lower degree.

Now, the doubt I have spoken of must not be merely chimerical or conjectural. It must be reasonable, and it must arise from a candid and impartial investigation of the case. In order to justify an acquittal the doubt must be such that if the same sort of a doubt were interposed in the graver transactions of life it would cause a reasonable and prudent man to pause and hesitate. If, after considering all the evidence, you can say that you have an abiding conviction of the truth of the charge, then you are satisfied beyond a reasonable doubt.

If nine of you agree upon a verdict you may render the same.

Let the verdict, be it what it may, which you shall render, be what each of you who votes for it conscientiously believes it ought to be upon the evidence adduced and upon the law as given to you by the court. On the one hand, let not sympathy for the defendants deter you from rendering a verdict of guilty of murder in the first degree against one or more of them, if the evidence satisfies you beyond a reasonable doubt that such verdict ought to be rendered; on the other hand, let not fear of the imputation that you are lacking in courage deter you from rendering a verdict of guilty only in a lower degree of the offense, or of not guilty, if upon the evidence you believe that that ought to be your verdict.

The clerk has prepared a form of verdict which will be handed

to you. It already reads as follows: "We, the jury in the above entitled cause find the defendant Yamane Nenchiro, then a blank following, find the defendant Ihara Ichigoro, and so on, naming the defendants, with the blank. The foreman, after the verdict is agreed upon, will insert in the blank following the name of each man whatever the verdict is as to that man, inserting the words "not guilty," or "guilty of murder in the first degree," or "guilty" or "not guilty" of murder in the second degree, or of manslaughter, whatever the verdict is, and so on, specifying throughout opposite the name of each defendant.

Gentlemen, the responsibility which now rests upon you is a most serious one. May God help you in your deliberations."

The bill of exceptions is as follows:

"1.    That on the 5th day of May, 1899, defendants filed a motion to quash said indictment and certain counts therein contained upon grounds in said motion stated. That on the 6th day of May aforesaid the court overruled said motion and declined to quash said indictment or any part thereof. To which ruling and order said defendants duly excepted and the exception was allowed by the court."

The points raised in this exception have been already discussed.

"2.    That thereafter, to-wit, on the 11th day of May aforesaid, one Robert Hutchins was called and sworn as a witness for the prosecution, and upon his direct examination was asked the following question:    'Do you know anything from your own knowledge with regard to any possible feeling between the Japanese and the Chinese on the plantation?' Referring to Kahuku plantation. To which question the witness replied. 'The feeling between them has not been very good. They have been enemies ever since I have been there.' To which question and answer defendants' counsel objected and moved to strike the same out on the ground that the testimony was irrelevant, incompetent and hearsay in that the question was general and not confined to the Japanese on trial. The court then ruled as follows:

'The basis for his knowledge will appear, I allow it to remain for the present.' Whereupon the Attorney-General asked the witness the following question: 'How has this feeling manifested itself?' The witness replied, 'Well, whenever they were working together.' That defendants' counsel again objected to the testimony upon said grounds. The court overruled the objection and admitted the testimony, to which ruling defendants duly excepted and the court allowed the exception."

As more fully appears from the charge of the court, *supra*, one of the questions presented for the consideration of the jury was whether a conspiracy existed among the Japanese to do grievous bodily harm or to injure or assault the Chinese in general, and evidence of the nature here offered is admissible as tending to show the ground for or origin of the conspiracy. This exception is overruled.

"3. That thereafter one Cheong Pong was called and sworn as a witness for the prosecution and was asked on direct examination certain questions relating to an alleged attack by the defendant Yamane upon one Yee Ling Chung, which was said to have occurred subsequently to the assault upon Chew Foon Wing, the deceased, as more fully appears on page 161 of the transcript of testimony hereto attached. Defendants' counsel objected to the testimony, the ground of objection being that the testimony was irrelevant and immaterial, not having any bearing upon the matter of malice, motive or intent as to the prior assault upon Chew Foon Wing. The court overruled the objection and admitted the testimony. Defendants excepted to the ruling and exception was allowed."

The whole row or fight occupied not over fifteen minutes and one act followed another. The attack upon Yee Ling Ching was a part of the whole affair; it was a part of the *res gestae* and evidence of the acts and doings of the defendant Yamane during that period were admissible against Yamane. *Rep. Haw. v. Tsunikichi*, 11 Haw. 341. Exception overruled.

"4. That thereafter, to-wit, on the 12th day of May aforesaid one Edward Worthington was called and sworn as a witness for the prosecution and was asked upon direct examination the following questions to which he replied as follows:

"Q. Did any other Japanese complain to you about the ill-treatment by Chinese on that afternoon? 
A. The only man who complained at all was that one who wanted to telephone to the consul. He didn't make any complaint to me.

Q. Did you see any Japanese who had been injured in that conflict? A. No.

Q. Was there any statement made by these defendants that they acted in self-defense at that time? A. No." To which testimony defendants' counsel objected and moved to strike it out

as being irrelevant and immaterial, it not being incumbent on defendants to make complaint or state their defense prior to the trial in court. The objection was overruled by the court, defendants excepted to the ruling and the court allowed the exception.

If the Japanese who took part in the fracas did make complaints, such might be admissible, but assuming that the fact that they did not make any complaints would not properly be admissible, still we do not deem it such prejudicial error as to warrant a new trial.

"5.    That thereafter, to-wit, on the 18th day of May aforesaid, the cause having been closed, the court charged the jury, among other things, that if nine of them should agree upon a verdict they might render the same, and the court refused to charge the jury, as requested by defendants' counsel, that the jurors should be unanimous, as more fully appears by the record herein.    Defendants excepted to the charge as given on said point and the refusal of the court to charge as so requested.    Said exceptions were duly allowed by the court.    The defendants also excepted to the verdict as not being unanimous."

This exception is overruled.    The cases of *Rep. Haw. v. Edwards*, p. 55 *ante* and *Rep. Haw. v. Edwards*, 11 Haw. 57.1, decide this point, which was submitted without argument in view of those decisions.

"6 and 7.    The defendants excepted to the verdict on the. grounds that the same was contrary to the law and the evidence and the weight of the evidence.    This exception will be considered with the motion for a new trial.

"8.    The defendants moved for a new trial and that the verdict as to them and each of them be set aside on the following grounds:    (1)    That the verdict was and is contrary to the law and the evidence and the weight of the evidence.    (2)    That many errors occurred in the proceedings and during the trial of said cause which were duly excepted to by defendants.    (These have been discussed herein); and (3)    That the testimony of the witnesses for the prosecution was given in the English, Chinese, Hawaiian and Portuguese languages, was not understood by either of them, said defendants, and was not interpreted or made known to them."

Affidavits supported this motion, the substance of which will be hereafter set forth.

The defendants were ably represented by competent counsel, A. G. M. Robertson, Esq.

*Eighth exception.* The third ground of the motion for a new trial, "That the testimony of the witnesses for the prosecution was given in the English, Chinese, Hawaiian and Portuguese languages, was not understood by either of said defendants and was not interpreted or made known to them."

This was supported by affidavits of the defendants to the effect that they were native born Japanese, never lived in any other country than Japan until they came to these islands where they resided for from three to seven years; never studied English language; cannot carry on conversation in English or Hawaiian, knowing only a few words in common use; do not understand Chinese or Portuguese; that the testimony was not interpreted to them or otherwise made known to them during the trial; and do not know what those witnesses for the prosecution said while in the witness stand. The affidavit of counsel also shows that the evidence of the prosecuting witnesses was not interpreted or explained in Japanese to defendants.

The contention is that the provision of the Constitution, Article 6, Section 2, that the accused "shall in all cases have the right to meet the witnesses who are produced against him face to face" includes the right to have an opportunity to understand what the witnesses say, that it is a personal right that cannot be exercised by counsel and that it is a right that cannot be waived in a capital case.

This contention was made in the case of *The King v. Ah Har, et al.*, 7 Haw. 319. Judd, C. J., says: "We agree with the contention of counsel for the defendants, that the constitutional right of the accused person 'to meet the witnesses who are produced against him face to face' is not complied with unless he is in some way made to understand their evidence, in order to enable him to avail himself of his further express constitutional right of cross-examining these witnesses, and also to meet their evidence with his own proofs. Although the origin of the constitutional requirement that an accused person shall be confronted with the witnesses against him, was to prevent the taking of depositions against an accused person in his absence he having no opportunity of hearing them or cross-examining them, the mere personal presence of the witnesses before the accused would not

obviate this, if their testimony was given in a language not understood by him."

"But this article of the constitution also says that he may 'by himself or his counsel, at his election, examine the witnesses,' etc. Whoever, by the election of the accused, undertakes the exercise of this right, whether it be the accused himself or his counsel, has a right to know what the evidence of the witnesses produced against the accused is. For this reason, as well as because the court must understand the evidence, interpreters are provided in all our courts of justice. But if the accused has counsel who understands the evidence, whether directly from the witnesses or through an interpreter, the constitutional requirement is complied with, though the accused himself may not understand it. It is presumed that counsel will communicate with client. * * * * The right, which an accused has of knowing what the witnesses say against him is absolute when he has no counsel. When he has counsel who understands the testimony, but does not himself understand the evidence, the court will not refuse, if requested, to have the evidence interpreted to him; but this request must be seasonably made, and the accused waives it, if he allows the case of the prosecution to be put in without it."

The case of Ah Har was a misdemeanor and the present case being a capital case, the defense claims that the defendants stand upon all their rights, waiving nothing and that the defendants are in the same position as the defendants in the Ah Har case would have been had they seasonably requested the interpretation and it had been refused.

The case of *The King v. Ah Har* is decisive of the law in Hawaii, and is applicable to capital cases as well as those of misdemeanor. The court's attention was not called by counsel or by the defendants to the want of interpretation into the Japanese language, nor was any objection made or exception taken. It is true that the defendants did not expressly waive the right to interpretation, but on the other hand they cannot be allowed to quietly stand by and allow the case to proceed throughout a long trial without raising any objection where they are represented by able and competent counsel and then after conviction claim that they did not and could not waive any right in a capital case.

That a defendant can waive his constitutional right to be confronted with the witnesses and other constitutional rights even in a capital case—see *Williams v. State,* 61 Wis. 281, *State v. Wagner,* 78 Mo. 644; *State v. Polsen,* 29 Iowa 133; Bish. New Crim. Proc. Vol. 1, section 1205.

In the matter of *W. C. Jones,* 3 Haw. 240, it was held that an attorney at law cannot waive his client's constitutional right to meet the witnesses against him. The attorney of the accused consented to the taking of depositions of witnesses for the prosecution, who were about to leave the country; the accused was not present, nor was he informed of the matter nor was his consent obtained. No authority was given to the attorney to agree to the depositions. At the trial, on the objection of the accused, the depositions were rejected. That case does not decide that if the accused was present and consented to the taking of the depositions, then the depositions would be rejected. Nor does it decide that the accused himself could not waive his right to meet the witnesses.

Nothing remains now to consider but the exceptions to the verdicts in the cases of each of the three defendants on the ground that they are contrary to the law and the evidence.

It is claimed in behalf of Ihara that the verdict against him was clearly contrary to the weight of the evidence; that according to the testimony of various witnesses for the prosecution Ihara could not have been present at the commencement of the fight, and that Chew Foon Wing was killed prior to his arrival on the scene; that the jury in convicting him must have been influenced by the fact that he failed to take the stand in his own behalf, or because of his admission to another of the witnesses for the prosecution that he had cut off the queues of five Chinamen, or, because they believed he was implicated in the death of others of the Chinese, and that he was convicted on general principles because the jury may have thought that, as three Chinamen had been killed and many others severely injured, at least one Japanese ought to be hung. It is further claimed in his behalf that the testimony of the Chinese witnesses who claim to have witnessed the assault on Chew Foon Wing, which resulted

in his death, was absolutely untrustworthy, inasmuch as their statements as to the wounds which caused his death are absolutely irreconcilable with the evidence of Doctor Wood, who performed the post mortem on the deceased.

It is also contended that the verdicts as to defendants, Yamane and Osaki, show that the jury must have repudiated the only theory upon which they could have legally convicted Ihara of murder in the first degree.

Similar arguments are also advanced in the cases of defendants, Yamane and Osaki, the further contention being made in their behalf that the evidence with regard to them shows that they were guilty of murder with deliberate, premeditated malice or nothing, and that the facts proved do not warrant a verdict of manslaughter.

With regard to the arguments attributing the verdict to prejudice on the part of the jury: in the absence of any direct showing to that effect it cannot be inferred that the jury was actuated by such motives, but, on the other hand, the strong presumption is that the jury, in arriving at their decision, weighed the evidence before them and followed the instructions of the court.

We do not feel called upon to attempt to reconcile the evidence in this case, or in any case, but simply to ascertain whether there is evidence sufficient to justify the jury in finding as they did. We are not to retry the case ourselves, nor should we, although the evidence may not be as satisfactory as we would wish to establish the guilt of Ihara of murder in the first degree, for that reason disturb the verdict of the jury whose province it was to weigh the evidence and who presumably did so.

"The weight of the evidence and its convincing effect was for the jury and not for the court. In criminal cases the effect which the evidence shall have as tending to establish the guilt of the accused is for the jury. If they find it insufficient to establish guilt there is no power in the court to set aside their verdict though the trial judge might be convinced that the verdict was against not only the weight of the evidence, but against all of the evidence. On the other hand, if there be evidence which fairly tends to prove the guilt of the defendant, and the jury find the

guilt, the court cannot properly set aside such verdict because he may entertain doubts as to its sufficiency to establish such guilt." *Williams v. State,* 61 Wis. 289.

"While we might desire more conclusive evidence to relieve our minds from all doubt, were we passing as jurors upon it, yet, we are unable to say that it is not of a character which sufficiently authorized the jury to conclude, beyond a reasonable doubt, that the defendant is guilty. It was the province of the jury to determine the weight of the evidence, and to say whether it is sufficient to authorize a conviction. We see nothing in the record which will justify the conclusion that this duty was not fairly and legally performed." *State v. Polson,* 29 Iowa 137.

The evidence against these three defendants is of such a nature that we find it impossible to disturb the verdict.

As regards Ihara: It appears in evidence that immediately before the uproar started at the Chinese camp he met two of the witnesses for the prosecution, Kiesal and Kamaka, near the Japanese camp at a place some 250 yards distant from the Chinese camp where the riot and killing took place. Immediately after this meeting noise of trouble was heard, presumably the shouting of Fugimoto and his companions for help. Ihara was then armed with a knife, and stated to these witnesses that he was bound for the fight, was armed, and had no fear. At the time of this conversation Yamane was running up and down through the Japanese camp, shouting in an excited manner. Between the place where Ihara met Kiesal and Kamaka, and the place where the Chinese, Chew Foon Wing, was killed, Ihara met and inflicted two wounds, at first considered mortal, on a Chinaman named Au Man Cheong, who, however, subsequently recovered. He identified Ihara as his assailant, and also testified that other Japanese were with Ihara armed with pieces of wood. Chew Foon Wing was killed at a short distance from where Au Man Cheong was stabbed. Two witnesses, Cheong Shay Po and Tom Fook Sheu, saw the assault made on Chew Foon Wing, which resulted in his death, and they identified Ihara as the one who struck him with a club or piece of wood, felling him to the ground. They also testified that Yamane was present and assaulted him with a

knife and cut off his queue; and that Osaki also was there and had a hatchet.

It also appears that subsequent to the assault on Chew Foon Wing, Ihara stabbed a Chinaman, Yee Fook Sing, giving him a blow which was fatal, but, as there is also evidence that the skull of Yee Fook Sing was also crushed in by another fatal blow as if from a hammer, his death resulted from either or both wounds. There is testimony of other assaults committed by Ihara during the row, and it is in evidence that he admitted to one Costa that he was in the fight, and that he had cut off the queues of five Chinese.

These facts certainly tend to prove that Ihara acted with deliberate, premeditated malice.

In addition to their connection with the assault on Chew Foon Wing there is evidence that Osaki was seen, during the fight, running with a knife in his hand, covered with blood, and was also seen attempting to cut off a queue, and there is evidence also of other acts of participation on his part.

Yamane was also identified by numerous witnesses as having been concerned in attacks on other Chinamen, notably, on Lee Ling Cheong, with a knife, and there is also evidence that he was present at the Hop Hung Camp around which the riot centered, armed and taking a prominent position.

There is abundant evidence tending to show that the attack by the Japanese upon the Chinese was preconcerted. According to the testimony of Kiesal and Kamaka, during their conversation with Ihara, before the trouble started, Japanese to the number of about fifty were walking up and down at the Japanese camp, evidently waiting, on the alert, and arming themselves with sticks and other weapons; and we have the direct statement from one of the defendants' witnesses, Doi, that at the cook-house on Sunday morning, the day of the fight, the danger of Fugimoto and his companions going over to the Chinese camp alone was discussed, and it was agreed that, on their calling for help, the Japanese in general should be ready to proceed, and should proceed, to the Chinese camp to their assistance.

In finding Ihara guilty of murder in the first degree the jury may have adopted any one of the theories outlined in those portions of the charge which read as follows:

"But, if in this last mentioned case, that is, a running to the rescue in response to cries for help, and meeting their fugitive countrymen entirely out of danger, such an occurrence was used by the defendants or any of them solely as a pretext for wreaking their vengeance upon the Chinese, and if such defendants did thereupon, with deliberate, premeditated malice aforethought, or with extreme atrocity, or with extreme cruelty, assault and kill Chew Foon Wing, or if, being present, they aided, incited, encouraged or countenanced such killing with deliberate, premeditated malice aforethought, or with extreme atrocity, or with extreme cruelty, then you must find such defendants guilty of murder in the first degree."

"And so also, if you believe from the evidence that prior to the assault on Chew Foon Wing, which resulted in his death, a conspiracy was formed, to which the defendants or one or more of them were parties, having for its object an attack upon the Chinese at their camp, of which body Chew Foon Wing was one, and the doing of grevious bodily harm to Chew Foon Wing, in particular, or to the Chinese in such camp in general, or the killing of one or more of them, and that in pursuance of such conspiracy such attack was made, and that Chew Foon Wing was killed by one or more of the members of such conspiracy, whether defendants themselves or others, during such attack, and that the members of such conspiracy acted, and that the assault was made with deliberate, premeditated malice aforethought, and without authority, justification or extenuation by law, then you must find all of such defendants who so entered into such conspiracy, and who continued in it until the killing, guilty of murder in the first degree whether they were actually present at the killing of Chew Foon Wing or not."

"Again, even if you find there was no conspiracy prior to the assault on Chew Foon Wing, which resulted in his death, still, if you believe from the evidence that some one or more of the defendants, with deliberate, premeditated malice aforethought, or with malice aforethought, and with extreme atrocity or cruelty, and without authority, justification or extenuation by law committed the killing of Chew Foon Wing, or participated therein, or, being present, aided, incited, countenanced or encouraged such killing, or rather, aided, incited, countenanced or encour-

aged one of themselves that is, the defendants, or some one other than the defendants, to commit such killing, in such case also you must find such of the defendants as aforesaid guilty of murder in the first degree."

We also call attention to those parts of the charge which read as follows:

"All who take part in the commission of an offense, or being present, aid, incite, countenance or encourage others in the commission thereof, are principals therein, even though they may not have previously conspired to bring it about."

"Any person who, not himself being present at the commission of an offense, abets another in the commission thereof, or incites another to commit the same, which such other thereupon, in pursuance thereof, commits, is an accessory before the fact."

And as to conspiracy:

"It makes no difference in the degree of responsibility resting upon those conspiring to do an unlawful act, that some were not present at the consummation of the design of the conspiracy. Where persons combine to stand by one another in a breach of the peace, with a general resolution to resist all opposers, and, in the execution of their design, a murder is committed, though at the time of the act some of them were at such a distance as to be out of view, if the murder be in furtherance of the common design."

"In order to convict the defendants or either of them of murder in the first degree, you must be satisfied beyond a reasonable doubt that the defendants, or such of them as you may convict, gave to Chew Foon Wing the fatal blow or blows, either actually or constructively; or that they were parties to a common design having for its object *the killing of Chew Foon Wing or the Chinese there in general,* or the infliction upon him or them of great bodily harm, it not being necessary however to show malice against Chew Foon Wing in particular if it is shown to have existed against the Chinese in general."

"It is not necessary, in order to constitute murder in the first degree, that the defendants, or any one of them, should have struck a fatal blow or even touched Chew Foon Wing, or have attempted to touch him. If the evidence shows beyond a reasonable doubt that Chew Foon Wing was, in fact, murdered with deliberate, premeditated malice aforethought, directed either against him individually, or against the Chinese camp or the members of that camp of which he was a member, or, if he was

in fact murdered with extreme atrocity or extreme cruelty, and that the defendants or any of them were present, and aided, incited, countenanced or encouraged others in the commission of the murder, then you must find such defendants guilty of murder in the first degree."

The case against the defendants, Yamane and Osaki is not parallel with the case of *Republic v. Kapea*, 11 Haw. 293, in which there was no testimony to reduce the offense below the grade of murder. That was the sole point in issue in that case, but, in the present case there is evidence showing that Yamane and Osaki were present at the killing of Chew Foon Wing, although it may be uncertain who struck the fatal blow, and it is unnecessary to consider what influenced the jury to reduce the offense from the crime of murder to the crime of manslaughter. Independently of Ihara there is evidence on which they well might be found guilty of manslaughter. As was said by the court in the case of *Stevenson v. U. S.*, 162 U. S. page 313:

"So long as there was some evidence of manslaughter, though the evidence that it was murder and not manslaughter was in the opinion of the court overwhelming, the credibility and force of the evidence was for the jury, and was not matter of law for the decision of the court." Cited in *Republic v. Kapea*, 11 Haw. 293.

It may be that the jury considered that Ihara was influenced by premeditated malice aforethought; and that Yamane and Osaki were simply moved by the excitement in carrying on a conspiracy which did result in the death of Chew Foon Wing; such a conspiracy not amounting to a conspiracy to murder. but resulting in homicide.

It was not necessary for the jury to find all equally guilty of murder, but, it was within their province, on the evidence and under the charge, to make a distinction. In this connection also it is well to bear in mind that portion of the charge which reads as follows:

"If you believe from the evidence that, in such last mentioned case, that is: a going to the rescue of their fellow countrymen while the latter were in great bodily peril of life or limb, the defendants or some of them used, or aided, incited, countenanced

or encouraged the use of, more force than was reasonably necessary to save their countrymen, and that the death of Chew Foon Wing resulted from such force so used, but, if you also believe that such excess of force was used, or aid or encouragement there to given, while such defendants were in the heat of passion caused by an attack on their countrymen, and was not used with malice aforethought, then such heat of passion was caused by an adequate provocation, and you must find such defendants so using or encouraging an excess of force guilty of manslaughter, and fix the degree in accordance with your estimate of the facts proven."

The evidence is voluminous, and inasmuch as the record contains the testimony of various witnesses describing to the best of their ability the occurrences of a running fight lasting not longer than ten or fifteen minutes, viewing the scene from various standpoints, and under the influence of excitement, it is only to be expected that it should appear to be contradictory in many of the details, some of them apparently important. It is the seriousness of these discrepancies that has resulted in leaving us not as well satisfied with the testimony on the whole as we would wish to be, nor will we attempt to reconcile them. But, the fact that these discrepancies existed should not influence us, and certainly it did not influence the jury, to discredit the testimony as a whole.

While it is difficult to reconcile many parts of the testimony we find that the jury had sufficient evidence before them to justify them in arriving at the conclusions they reached, and we decline to interfere with the verdict.

The exceptions are overruled.

*Attorney-General H. E. Cooper* for the prosecution.

*Messrs. Robertson & Wilder* for the defendants.