## TERRITORY OF HAWAII *v.* YOSHIKAWA DENGIRO.

EXCEPTIONS FROM CIRCUIT COURT, FIFTH CIRCUIT.

SUBMITTED APRIL 22, 1903.          DECIDED JUNE 13, 1903.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

The court in the charge to the jury gave a synopsis of the evidence offered by the prosecution without referring in any way to the evidence for the defendant.   Held, that this was error for which a verdict of conviction should be set aside and a new trial ordered.

OPINION OF THE COURT BY GALBRAITH, J.

Yoshikawa Dengiro, a Japanese, was convicted of the murder of Yoshiaya Kosaku, a fellow countryman, on the 26th day of May, A. D. 1902, at Kapaa, Island of Kauai, Territory of Hawaii, and sentenced to be hung.   Three exceptions taken to alleged errors of law during the course of the trial and embodied in a bill of exceptions, duly allowed, are urged as grounds for reversal of the judgment and for ordering a new trial.

It appears that the deceased and his wife were plantation laborers and lived in a one roomed hut or house, at Kapaa, Kauai; that the deceased was 47 years of age and his wife 39; that they had been married 21 years; that the defendant was 20 years old and was the adopted son of the deceased and his wife, Yoshikawa Ichi; that they had caused him to come to the islands from Japan, about three months prior to the homicide, and that he had lived in the hut with the deceased and wife.

The wife of the deceased was the principal witness for the prosecution. She testified in substance that she, the deceased, and the defendant had resided together in the house for about three months prior to May 26, 1902, that the defendant did not work but loafed around the house and the deceased told him on May 26, 1902, to go to Honolulu; that the defendant said he would go and left the house about 7 o'clock in the evening of that day; that the defendant remained away until about 11 o'clock that night when he came to the door of the hut and called out for his clothes; that the deceased arose from bed and picked up the clothes which were tied in a bundle and lying on the floor opened the door and passed the bundle out to the defendant; that immediately the door was opened the defendant without saying a word commenced to shoot at the deceased, firing three shots in rapid succession; that the deceased was shot in the neck but did not fall and started out of the house towards the defendant and followed him around to the rear of the house; that the lamp was burning brightly in the room but it was dark outside; that the witness being very much frightened at the shooting arose from bed and ran out of the house and hid under a grass hut near by and after she reached the hut she heard five more shots fired from the rear of the house in the direction where the deceased and defendant disappeared.

Sometime later that night the police found the dead body of the deceased in the rear of the house and there were eight or nine bullet wounds on it. About the same time the defendant was arrested near the house and a revolver and cartridges were found in the sleeve of his kimono. It was shown that the defendant purchased the revolver and cartridges at the neighbor-

ing store about five o'clock in the afternoon of May 26, 1902. It was shown that the wounds on the body of the deceased were made by balls from a revolver similar in calibre to that found on the defendant.

The defendant testified in his own behalf in substance as follows: that on the day of the tragedy and the day preceding his father had been drinking saki freely and had beaten his mother and when he interfered had struck the defendant and had threatened to kill him; that before he was told to go to Honolulu and before he left the house in the evening of the 26th of May his father was busy sharpening a knife (described as a vegetable knife with blade 4 inches in length) and was "acting crazy like;" that he bought the revolver to protect himself because he was going to Honolulu; that when he returned to the house at night for his clothes, he went to the door and called out and then sat down in a chair to wait for the clothes to be handed him; that when the deceased opened the door and saw the witness he threw the bundle of clothes at him and came towards him with the knife in his uplifted hand; that from his attitude and action and the previous threats the witness thought that the deceased intended to kill him and he shot three times at his legs and then ran away and did not see the deceased afterwards.

The first exception was to the ruling of the court admitting the revolver in evidence on the ground that the identification was incomplete. The error in this ruling, if any, was fully cured by subsequent testimony and the admission of the defendant.

The second exception was to one of the instructions of the court to the jury excepted to at the time and duly embodied in the bill of exceptions wherein the court said: "You have heard the evidence of the prosecution offered in proof of this charge. I give you a condensed synopsis of it, namely, that of the wife of Kosaku detailing the circumstances of the shooting; of Mau Kee, who testifies that the defendant bought of him at his store at Kapaa on the 26th of May at 5 P. M. a revolver, 32 caliber and 50 cartridges 32 caliber paying $7.50 for the pistol and $1 for cartridges. He testified that defendant was the only Jap-

anese to whom he had sold a revolver. Deputy Sheriff Haae testi-
fies that he went to the house of Kosaku between 11 and 12
o'clock on the night of May 26. Took defendant in custody,
found revolver and cartridges on his person in his sleeve. The
revolver was loaded, saw Kosaku dead back of the house.
There were eight wounds on his body, on face and neck and
side. Next day went back and searched for empty shells
found some in front of house and some behind it. The shells
were of 32 caliber. The police officer Kumuao testifies that he
saw defendant purchasing a 32 caliber revolver at Mau Kee's
store on May 26th, a small 6 chamber revolver 32 caliber.
Sheriff Coney testifies that he came to Kosaku's house at Ka-
paa. Found his dead body with not less than eight bullet wounds
in it. Went to the place where the body was said to be, found
there this bullet No. 32 produced in evidence, back of house
between gate and water-closet. Haae handed me the revolver
and cartridges taken from defendant. They have been in my
possession ever since. Seven empty shells were found, some near
corner of house. Dr. Waughop testified that he examined the
dead body of Kosaku, found nine bullet wounds. He identified
one bullet produced in court as the one he took from a rib of
Kosaku in which it was imbedded. Mr. Rice testified as to the
caliber of the pistol the empty shell being number 32." This
summary is confined entirely to the evidence of the prosecution.
No reference is made to the testimony of the defendant nor were
the jury reminded in this instruction or in any other part of
the charge that they were, under the law, the "exclusive judges
of the facts."

The statute defining the province of the jury in jury trials
in this Territory reads as follows: "The jury shall in all
cases be exclusive judges of the facts in suits tried before them,
and the judge or justice presiding at any jury trial (herein-
after named the court), shall in no case comment upon the char-
acter, quality, strength, weakness or credibility of any evidence
submitted or upon the character, attitude, appearance, motive
or reliability of any witness sworn in a cause. Provided, how-
ever, that nothing herein shall be construed to prohibit the

court from charging the jury whether there is or is not evidence, (indicating the evidence), tending to establishing or to rebut any specific fact involved in the cause, nor shall it be construed to prohibit the setting aside of a verdict rendered by such jury, in a proper case, as being against the weight of the evidence, and the granting of a new trial therein." Sec. 1355, C. L. This statute makes the jury the "exclusive judges of the facts" and does not require the court to make a summary or synopsis of the evidence for them. It is contended by the attorney general that the court had a right to make a fair summary of the evidence to the jury. This may be true but a summary that only considers the evidence of one side and totally ignores that of the other cannot be said to be a fair summary. This synopsis in the charge complained of was not fair to the defendant for the reason that it ignored his defense and his testimony in support of it altogether.

"We assume it to be the law, that, while it is not, in this state, the duty of the trial judge to sum up the evidence to the jury, yet it is not improper to do so providing it is fairly done, and all the material evidence on both sides is fairly presented. The judge should not single out isolated parts of the testimony, and instruct as to the law arising on the facts which such testimony tends to prove, nor give undue prominence to certain portions of it, and especially ought he not to review with synopsis only those facts which have a tendency to establish one side of the case. When one single fact is selected and strongly commented on, the tendency is to distort its importance in the estimation of the jury, and to concentrate attention too intently upon it, to the undervaluing of the rest of the evidence." *Morgan v. The State,* 48 O. St. 371, 377, 378; *Thompson on Charging the Jury,* p. 111; *Shank v. The State,* 25 Ind. 207, 209; *The State v. McNeill,* 93 N. C. 552, 557. *People v. Lyons,* 49 Mich. 78.

The judge's synopsis of the evidence for the Territory given without reminding the jury that under the law they were the exclusive judges of the facts may be said to have been an invasion of the province of the jury by the court or at least to have

given undue prominence to the evidence for the prosecution and to have overlooked the real issue in the case. The shooting was admitted by the defendant. The real issue in the case under the testimony was whether or not there was any justification for the killing. This issue seems to have been entirely ignored. There were but two eye-witnesses to the tragedy or any part of it—the mother and the defendant.

The one testified for the Territory and the other for the defense. Their evidence was conflicting to a degree. If the jury believed the testimony of the mother the defendant was guilty of the crime charged and if they believed his story he was not guilty. The defendant was on trial for his life. He had a right to demand that his evidence with that for the Territory should be submitted to the jury under proper instructions on the law without undue prominence being given to any part of it. This right was denied him and on this account we cannot say that the defendant had what every one accused of crime is entitled to, namely, *a fair trial*. For this reason the exception is sustained and the verdict of conviction is set aside and the cause is remanded to the Circuit Court of the Fifth Circuit with direction to grant a new trial.

*S. K. Kaeo* and *Creighton & Correa* for appellant.

*L. Andrews, Attorney-General,* and *William S. Fleming* for Territory.