## TERRITORY *v.* I. GOTO, ET AL.

## No. 1416.

EXCEPTIONS FROM CIRCUIT COURT FIRST CIRCUIT.
HON. J. J. BANKS, JUDGE.

ARGUED FEBRUARY 6, 1923.                    DECIDED APRIL 26, 1923.

PETERS, C. J., PERRY AND LINDSAY, JJ.

CONSTITUTIONAL LAW—*indictment—allegations—insufficiency or defectiveness of—waiver of constitutional rights.*

> Defendants were charged with maliciously or fraudulently conspiring together to commit a felony, to wit, to unlawfully use and cause to be exploded dynamite for the purpose of inflicting bodily injury upon S, or to frighten and terrify him, or to injure, destroy or damage the house occupied by said S. The defendants did not demur or otherwise take exception to the indictment but, on the contrary, each defendant upon being interrogated specifically stated that he understood the nature of the accusation against him, and defendants, through their attorneys, in writing stipulated that the indictment was not uncertain by reason of in-

sufficient or defective allegations, and that they waived any insufficiency in the allegations of the indictment. After trial and conviction, on exceptions brought to this court, the question of the sufficiency of the allegations in the indictment being raised for the first time, held, that the alleged insufficiency or defectiveness of the indictment was waived.

CRIMINAL LAW—*conspiracy.*

Conspiracy implies concert of design and not participation in every detail of execution. It is not necessary that the plan or combination shall embrace in detail in its early stages the various means by which it is to be executed, as it is sufficient that there is a general plan to accomplish the result sought by such means as may from time to time be found expedient.

SAME—*instructions.*

Upon a trial under an indictment for conspiracy to unlawfully use dynamite, where there was evidence tending to show that certain of the defendants conspired together in Honolulu to commit violence upon a person living on the island of Hawaii, the precise manner in which the proposed violence was to be committed being left undetermined, and that thereafter certain other persons on Hawaii entered into the conspiracy, perfected the details thereof and determined upon and proceeded to use dynamite as the means and instrument of the proposed violence, the jury was properly instructed that if it found all of these facts beyond a reasonable doubt and that the act done was the reasonable and probable result of, and reasonably calculated to accomplish the original purpose, it might find all of the defendants guilty as charged.

SAME—*same.*

The court instructed the jury on behalf of the prosecution, that if it should find from the evidence beyond a reasonable doubt that the acts at Olaa were in consequence of an agreement formed at the tea house at 4 Miles near Hilo and that such agreement was in furtherance or continuation of a conspiracy formed on Oahu, such evidence would be sufficient to prove that the conspiracy charged in the indictment was, as a matter of law, formed on Oahu. Held, that this instruction fairly stated the law applicable to the case.

SAME—*venue.*

If a conspiracy be entered into in one county to commit an offense in another county and the original conspirators or others who joined the conspiracy later go into that other county to

Syllabus.

execute their plan of mischief and there commit an overt act, such overt act of any one of the conspirators in furtherance of the common design is considered in law a renewal or rather continuance of the original agreement by all the conspirators and the venue may be laid in the county where the agreement was entered into.

SAME—*conspiracy—evidence—acts and declarations of alleged conspirators.*

In a prosecution for conspiracy evidence of acts and declarations of the conspirators done or made in furtherance of the common purpose is admissible against all of the conspirators.

SAME—*evidence—order of proof.*

In a prosecution for conspiracy the order of proof is largely within the discretion of the trial court and the prosecution may, prior to the establishment of the existence of the conspiracy, offer evidence of acts and declarations by defendants and other facts and circumstances, which, standing alone, would appear immaterial but which are to be connected up and made material by evidence to follow.

EVIDENCE—*hearsay.*

Where hearsay evidence has been improperly admitted but there is other evidence covering the same ground, the error is cured.

SAME—*incompetent evidence erroneously admitted and later stricken by the trial court on its own motion.*

Where incompetent evidence was erroneously admitted and later stricken by the trial court on its own motion, the court carefully and explicitly instructing the jury to disregard same, the erroneous admission of such evidence is not a ground of exception where it appears that without the evidence stricken there was sufficient other evidence to support the verdict of the jury.

WITNESSES—*cross-examination.*

Where one of the defendants in a prosecution for conspiracy to commit a felony testifies on behalf of the defense, the object of his testimony being to show the improbability of the guilt of the defendants or the organization with which they were connected because, as it was said, the organization had constantly deprecated a resort to violence in the settlement of a strike, it was proper for the trial court to allow the witness to be interro-gated on cross-examination as to whether he knew of certain vio-lent acts alleged to have been committed during the pendency of

the strike, the scope and extent of the cross-examination of a witness in such cases being largely in the sound discretion of the trial court.

### OPINION OF THE COURT BY LINDSAY, J.

On August 1, 1921, the grand jury of the first circuit returned an indictment against the defendants, the first count charging that defendants "did maliciously or fraudulently combine, or mutually undertake or concert together to commit a felony, to wit, to unlawfully use and cause to be exploded dynamite or other explosive chemical or substance for the purpose of inflicting bodily injury upon one J. Sakamaki, or to terrify and frighten him, the said J. Sakamaki, or to injure, destroy or damage a certain house situate at Olaa   *   *   *   which said house was being occupied by the said J. Sakamaki as his place of abode, and that they   *   *   *   did then and there and thereby commit the crime of conspiracy in the first degree contrary to the form of the statute in such case made and provided." The second charged that defendants "did maliciously or fraudulently combine, or mutually undertake or concert together to commit a felony, to wit, to unlawfully use and cause to be exploded dynamite or other explosive chemical or substance in, at, under or against a certain house situate at Olaa   *   *   *   which said house was being occupied by one J. Sakamaki as his place of abode, for the purpose of inflicting bodily injury upon him, the said J. Sakamaki, or to terrify and frighten him, the said J. Sakamaki, or to injure, destroy or damage the said house," etc.

On August 2, 1921, defendants were duly arraigned and their pleas reserved from time to time until September 13, 1921, at which time each of the defendants, being represented by counsel, was asked separately if he understood the nature of the charge against him and if he was ready at that time to enter his plea, which questions being

answered in the affirmative, each of the defendants then entered a plea of not guilty.

On January 27, 1922, all of the defendants, through their then attorneys, entered into a written stipulation with the prosecution, which stipulation was approved by the trial judge, stipulating and agreeing "that the indictment and all counts thereof heretofore found against the defendants above named by the grand jury of this judicial circuit on the first day of August, 1921, may and shall be considered and understood as having been found and returned and as reading in the conjunctive instead of in the disjunctive and alternative, and that the said indictment and all counts thereof are not uncertain in that regard or on account thereof, and they, the said defendants, hereby waive any insufficiency in said indictment and all counts thereof by reason of said disjunctive and alternative pleading." At the time the foregoing stipulation was entered into, the grand jury was in session or within call, and an amendment to the indictment or a new indictment might have been obtained.

The trial was commenced on January 31, 1922, and concluded on March 4, 1922, on which date the jury returned a verdict finding all of the defendants guilty as charged.

The attorneys who represented the defendants throughout the trial have brought the case here upon exceptions, none of which go to the insufficiency of the indictment. At the oral argument on the exceptions before this court, one of the attorneys who conducted the trial on behalf of defendants and who had filed a brief herein in support of his bill of exceptions, expressly stated that he considered himself bound by the stipulation entered into by him on behalf of defendants, that he did not propose to and would not now urge that the indictment against defendants was in any manner defective or insufficient,

and that any attack that might now be made against the sufficiency of the indictment was entirely without his support or approval. Notwithstanding the stipulation and the attitude of the attorneys who had appeared for defendants throughout the trial, another attorney, appearing in this court for the first time as an attorney for defendants, has filed herein a supplemental brief in which the contention is made that the indictment is not sufficient to charge defendants with the commission of any crime, and that the verdict and judgment of guilty based on such indictment are contrary to the law for that reason. This attorney at the oral argument contended that the stipulation entered into between the other counsel for defendants and the prosecution was equivalent to an amendment of the indictment, and that no amendments to an indictment returned by a grand jury are permissible. He also argued that the attempted waiver is ineffectual. It is conceded by all of the authorities that amendments of an indictment returned by a grand jury may be made only by that body itself, and that no one else has the right to amend. Passing without further comment, the very unusual situation of defendants who, in one and the same breath and in the same proceeding, say through one attorney that they stand by their waiver and refuse to argue in derogation of the indictment and urge through another attorney that the indictment is bad, we are of the opinion that the stipulation in question cannot be construed as amounting to an amendment of the indictment. The trial court did express its approval of the stipulation and of the waiver contained therein, but it did not amend the indictment or attempt or purport to do so.

If it be argued that, by reason of the violation of one of the strict rules of criminal pleading, the indictment was defective (although we do not decide such to be the

case as a matter of law), have not the defendants waived whatever rights they may have had to question the sufficiency of the indictment? May a defendant in a criminal case be permitted to play fast and loose with the court by saying, first orally and later more positively in writing, that notwithstanding some apparent defects in the manner of charging him in the indictment, he is not deceived or misled thereby but, on the contrary, is in reality informed and aware of the nature and cause of the accusation against him and waives such defects, and then, after a long and tedious trial and conviction, come before the appellate court and for the first time contend that the conviction must be set aside because the indictment did not as a matter of fact charge him with the commission of any crime because, in the indictment, the word "or" was used where the word "and" should have been used, and that for that reason he is not informed of the nature and cause of the charge against him? It is not conceivable that such a course of conduct would be permitted among men of ordinary intelligence in dealing with the ordinary and even the weighty affairs of life, yet it is seriously argued that such conduct is permissible in courts of justice. If it might under other circumstances reasonably be said that, by reason of the allegations in question being in the disjunctive instead of the conjunctive, there was some doubt as to what crime defendants were charged with, does it not expressly appear in this case that not a vestige of doubt exists, when the defendants themselves have distinctly and unequivocally said and their counsel "learned in the law" have solemnly stipulated and agreed in writing, that neither the defendants nor their counsel had any doubt whatever of the nature of the accusation against the defendants?

That certain constitutional rights guaranteed to persons accused of crime may be waived has been held in

numerous instances.   Before Hawaii became a part of the
United States and while these islands formed the Re-
public of Hawaii, the Constitution of the Republic pro-
vided that in criminal trials the accused "should in all
cases have the right to meet the witnesses who are pro-
duced against him face to face," which provision is
practically the same as that contained in the sixth
amendment to the Constitution of the United States that
the accused shall enjoy the right "to be confronted with
the witnesses against him."   In the case of *Republic* v.
*Yamane,* 12 Haw. 189, the defendant with several other
Japanese was indicted for murder.   Upon a conviction,
exceptions were taken to this court, one of the grounds of
exception being that the testimony of the witnesses for
the prosecution was given in the English, Chinese, Ha-
waiian, and Portuguese languages, was not understood by
either of the defendants and was not interpreted or made
known to them.   Counsel contended that the constitu-
tional right of the accused to meet the witnesses produced
against him face to face, includes the right to have an
opportunity to understand what the witnesses say, that
it is a personal right that cannot be exercised by counsel,
and that it is a right that cannot be waived in a capital
case.   This court held, citing with approval the case of
*The King* v. *Ah Har,* 7 Haw. 319, that while the right of
the accused to be confronted by the witnesses produced
against them clearly included the right to have the testi-
mony of such witnesses interpreted to them, such right
might be waived, the court saying, page 220, "the court's
attention was not called by counsel or by the defendants
to the want of interpretation into the Japanese language,
nor was any objection made or exception taken.   It is
true that the defendants did not expressly waive the right
to interpretation, but on the other hand they cannot be
allowed to quietly stand by and allow the case to proceed

throughout a long trial without raising any objection where they are represented by able and competent counsel and then after conviction claim that they did not and could not waive any right in a capital case. That a defendant can waive his constitutional right to be confronted with the witnesses and other constitutional rights even in a capital case—see *Williams* v. *State,* 61 Wis. 281; *State* v. *Wagner,* 78 Mo. 644; *State* v. *Polsen,* 29 Iowa 133; Bish. New Crim. Proc. Vol. 1, section 1205." See also *Diaz* v. *United States,* 223 U. S. 442.

Other constitutional rights accorded persons accused of crime under the sixth amendment are so frequently waived as to leave no doubt as to the right of such waiver; for example, the right to a speedy trial is frequently waived by the trial being continued for lengthy periods at the request or by the consent of defendant; the right to trial by an impartial jury of the state and district wherein the crime shall have been committed is frequently waived, for not only may accused accept without challenge the first twelve jurors drawn, thus at least tacitly ignoring and waiving the fact that some of the jurors may not be impartial, but accused frequently, by requesting or agreeing to a change of venue, are tried for crimes in districts other than that in which the crime was committed. See *State* v. *Faile,* 20 S. E. (S. C.) 798.

As to whether, if an indictment palpably stated no offense at all or the semblance of any offense, an accused could waive his right to be informed of the nature and cause of the accusation against him, under the facts in the present case we are not required to say. There are, indeed, many authorities to the effect that an indictment which, in seeking to inform the accused of the nature and cause of the accusation against him, charges the offense in the disjunctive instead of the conjunctive, is bad, upon

the theory that it charges no offense at all. But, as pointed out in *Territory* v. *Kim Ung Pil,* 26 Haw. 725, even the courts which so hold concede that the rule is not without qualifications. Its merits need not be here considered. It is based on a technicality of debatable substantiality; and when, as in the case at bar, the defendants and their able counsel have solemnly said to the court, after ample time for study and reflection, that they understand the indictment, that the presence of the word "or" does not mislead them or in any wise embarrass them in their defense and that the indictment fully informs them of the nature and terms of the charge against them, the alleged insufficiency or defectiveness of the indictment is one which may be constitutionally waived. Any other conclusion would, we think, be an affront to justice and common sense.

Several of the exceptions are for alleged errors committed by the trial court in allowing the acts and declarations of alleged conspirators to be admitted without any *prima facie* proof of the existence of a conspiracy.

Exception No. 1. Matsumoto, a witness for the prosecution, having testified that the defendant Fujitani had paid him $75 and told him he was to go to Hawaii, was asked whether he had asked Fujitani why he (the witness) was wanted to go to Hawaii. To which question the witness replied, "No, I did not. The only message I got was that I was told Fujitani got a message from Baba" (one of the defendants) "that for me - - - to send me over to the federation office in Honolulu as he wanted me to go to Hawaii. I did not ask him any other questions." Counsel for defendants moved to strike the answer on the ground that it was incompetent and not admissible on any theory at all against the defendant Baba and others, and that it was hearsay. After argu-

ment, the trial court denied the motion to strike, the city attorney undertaking to connect up the evidence later on.

Exceptions 3, 4, 5 and 12 are upon similar grounds.

The crime of conspiracy is, from its very nature, most difficult to prove and for that reason great latitude is allowed the prosecution in the manner of presenting its case. "Upon the trial of a charge of conspiracy, where the prosecution depends upon inferences to be drawn from facts to prove the conspiracy, great latitude of proof must be allowed, and the jury should have before them, and are entitled to consider, every fact which has a bearing upon and a tendency to prove the ultimate fact in issue." *United States* v. *Greene,* 146 Fed. 803, and in the same case on page 806 the court says: "How may a conspiracy be proved? By witnesses to the agreement itself, or by proof of facts from which the jury may infer it. Rare indeed are the cases where a conspiracy can be proven by witnesses who heard it made. From its very nature it is a secret or furtive agreement. Indeed, a famous writer upon criminal law, Mr. Archibald, declares that: 'A case cannot be easily imagined in which a conspiracy can be expressly proven, unless when one of the persons implicated in the conspiracy consents to be examined as a witness for the prosecution.'"

By the weight of authority the order in which proof of a conspiracy is offered lies in the discretion of the trial court. The rule is thus stated in a note in 3 Am. St. Rep. 489: "The state may prove the facts in any order it chooses as to conspiracy, and acts done and declarations made. The acts and declarations are sometimes admitted in evidence first, as a matter of convenience, upon an undertaking by the prosecution to subsequently connect the evidence by proof of the conspiracy." See numerous cases cited. In *Jenne* v. *Joslyn,* 41 Vt. 478, it was held that the order of the evidence is of no material conse-

quence so far as its ultimate legitimacy is concerned, provided it is in the end pertinent to the issue in its relation to the other evidence in the case.

"The time of admitting the declarations is a mere question of order in the proceedings which is a matter of discretion with the court. Nothing can be better settled than the main proposition that the declarations of one alleged conspirator cannot be admitted against his associates unless the conspiracy be established. There is, however, no rule that the conspiracy must be established first in the order of time. Convenience may require that the declaration be admitted provisionally subject to subsequent proof of the conspiracy. If that is not offered it should be stricken out." *Place* v. *Minster,* 65 N. Y. 89, 105. "When the whole evidence shows that a conspiracy actually existed, it will be considered immaterial whether the conspiracy was established before or after the acts and declarations of the members." *Spies* v. *People,* 3 Am. St. Rep. 320. The rule is admirably stated by Judge Cooley in *People* v. *Saunders,* 25 Mich. 119, where that learned author says: "It is complained that the acts and declarations of Winters were allowed to be given in evidence before proof had been made of any conspiracy. As this exception regards the order of proof merely, we think it is not one that can avail in this court. The proper order of proof in cases of conspiracy is, first to give evidence of the unlawful combination, and afterward to show the acts of the conspirators in pursuance thereof, or in some manner to connect them severally therewith. But it often happens that the existence of the conspiracy is only made out by inference from the acts and declarations of the several parties thereto; and to exclude evidence of these until the conspiracy is established in some other way, would, in some cases, give the guilty parties immunity. There is no class of cases in which it is more

important that the circuit judge should have a large discretion as to the order in which the evidence should be received; and this discretion can not be reviewed on error except in clear cases of abuse, of which we discover no proof here. The opening of the case by the prosecution, and any further explanations that may be called for, will generally enable the judge to exercise his discretion in such manner as, while not shutting out proper evidence, shall at the same time protect the accused from being prejudiced by testimony which, in the end, shall prove irrelevant, or not legally competent to charge the party on trial. And whenever facts are proved which depend upon other facts to give them a bearing upon the guilt of the accused, if such other facts are not put in, he has his remedy by motion to strike out the evidence. \* \* \* Mr. Roscoe justly says that, 'The evidence in conspiracy is wider than, perhaps, in any other case. Taken by themselves, the acts of a conspiracy are rarely of an unequivocally guilty character, and they can only be properly estimated when connected with all the surrounding circumstances.' Ros. Cr. Ev., 88." In a conspiracy case the order of presenting proof is immaterial. *Territory* v. *Soga,* 20 Haw. 71, 76. "The order of proof is a matter largely within the discretion of the trial court. Especially is this true in a prosecution for conspiracy where the facts are ordinarily involved and complicated. The government has the right to show the whole history of the conspiracy from its commencement to its conclusion and to do this it may, prior to the introduction of evidence of the conspiracy itself, offer evidence of admissions made by the defendants and other facts and circumstances which, standing alone, would appear immaterial but which are to be connected up and made material by evidence to follow." *Territory* v. *Belliveau,* 24 Haw. 768, 772.

Under the rule enunciated, the trial judge, in the exercise of sound discretion, properly allowed the acts and declarations of alleged conspirators to be admitted before proof of the existence of a conspiracy. Such evidence, however, would only become competent if the existence of conspiracy later appeared from the evidence in the case. For that reason it becomes necessary to consider at length the facts which appear or may be inferred from the evidence in the case.

Early in the year 1920 there occurred a strike among the laborers on the sugar plantations on the island of Oahu, which lasted until June 30 of the same year. Prior to the strike a complete system of labor unions throughout the Territory had been organized, each plantation having its own union which took its name from that plantation—for example, the union on Waipahu plantation was known as the Waipahu union, and that on the Waialua plantation as the Waialua union. On each island there was also a union for that island, for example, the Oahu union, the Hawaii union, etc. The personnel of the island unions was made up of representatives from the various plantation unions. In addition to the two classes of unions indicated, there was a supreme union or organization, having its headquarters in Honolulu and known, at first, as the Japanese Federation of Labor, and later as the Hawaii Laborers' Association. The members of this association, which we shall hereafter refer to as the federation, were called directors, and consisted of persons appointed by the various island organizations. The management and leadership of the strike was in the hands of the federation which, in furtherance of the strike, sent out published instructions to the various districts throughout the Territory and collected funds amounting to nearly three-quarters of a million dollars for the purpose of financing the strike. Although the

strike was confined to the island of Oahu it was aided financially by the various unions on the other islands, which sent contributions to the federation in Honolulu. Picketing gangs were maintained at different points on Oahu for the purpose of preventing laborers from returning to work.

While the strike was in progress one J. Sakamaki, who for many years had occupied an important position with the Olaa plantation, and was assistant postmaster at Olaa, was an active opponent of the strike, speaking against it and mailing and distributing throughout the Territory many printed pamphlets. On the night of June 3, 1920, while Sakamaki and his family were sleeping at his home at Olaa, dynamite was placed under his house and exploded, and, although no loss of life ensued, the house was damaged to a considerable extent.

The indictment named twenty-one persons as having conspired together to cause the unlawful act complained of. Of these, four were not apprehended. The charge against two of the alleged conspirators, viz., J. Matsumoto and I. Saito, was nolle prossed and the remaining fifteen defendants were tried and convicted.

At the time of the alleged conspiracy all of the convicted men were either officials of the federation of labor or connected with the various labor unions on the islands of Oahu and Hawaii. The headquarters of the Oahu union was at the same place in Honolulu as that of the federation.

From the uncontradicted evidence the dynamite which was exploded under Sakamaki's house was placed there by Murakami and Saito. Matsumoto, who with these two, had been chosen to do the dynamiting, accompanied them to the scene of the explosion, but while the dynamite was being placed under the house did not assist but remained in the motor-car with the driver ready to drive

with the others away from the vicinity. The charge against Saito and Matsumoto having been nolle prossed they became the chief witnesses against their alleged co-conspirators.

The testimony of Matsumoto is that on May 22, 1920, the defendant Fujitani, secretary of the Waialua union, telephoned to Matsumoto, who was in charge of the picketing at Wahiawa, requesting that he come to Waialua. There Fujitani told Matsumoto that he (Matsumoto) had to go to Hawaii; that orders had been received from the defendant Baba that he (Matsumoto) had to go to Hawaii to do some work and that he was to go to Honolulu and see Baba, from whom he was to obtain particulars. Fujitani then gave Matsumoto $75, saying that if he was going to Hawaii he would need some money for expenses. The following day Matsumoto went to the headquarters of the federation in Honolulu where he met the defendants Baba, Furusho, Kawamata, Takizawa, Tomoda, Hoshino, Tsutsumi, Miyazawa, Goto and Fujitani. Baba told the witness that he had to go to Hawaii and that further details would be given him by the directors of the Hawaii union. The other defendants just mentioned also told the witness that he had to go to Hawaii where he would receive further particulars and orders from the directors of the Hawaii union, some of these defendants further stating that upon the work of Matsumoto on Hawaii depended the success of the strike, and that they wanted him to do the best he could on Hawaii. Later in the day Matsumoto was given a ticket for his passage to Hilo by the defendant Fujitani, who stated that he also was going to Hilo on a speech-making tour. Matsumoto took passage on the steamer "Mauna Kea" and on arrival at Hawaii put up at the Okino hotel.

Saito, another witness for the prosecution, testified

that on the same day that Matsumoto went to federation headquarters, he (Saito) was also ordered to report there. On his arrival at headquarters he met the defendant Furusho, who informed him that one person had been picked from every place on this island to go to Hilo and that he (Saito) had been picked from Waipahu. Furusho told Saito: "There is an order issued from this - - - from the federation to Hilo and if you go to Hilo you will receive further orders of what you are going to do." (Tr. p. 238.) Kawamata, another of defendants, on the same occasion said to this witness: "It is exactly as Furusho has said to you, that an order from here has gone to the officials of Hawaii, if you will get there you will get further instructions, and I want you to obey the orders of that official." Furusho gave Saito $50, saying that he had not bought a ticket for him but to take the money and pay his fare when he got on board the steamer. Furusho further told Saito that when he got to Hilo he should put up at the Okino hotel. Saito thereupon took passage on the "Mauna Kea" under the assumed name of Akamine which name he adopted at the suggestion of the defendant Fujitani. On the same steamer were the defendants Fujitani and Murakami, also the witness Matsumoto. Fujitani said he was going to Hawaii on a speech-making tour but there is no evidence that he made any speeches and he returned to Honolulu the following week. On arriving at Hilo Saito, Matsumoto and Murakami all took rooms at the Okino hotel.

The testimony of the witnesses Saito and Matsumoto as to what took place on the island of Hawaii is practically the same and in substance is that on the day of their arrival in Hilo they reported at the office of the Hawaii union where they met the defendants Ishida, Koyama and Miyamura (Miyamura was not appre-

hended) and were told by these defendants to return to
the hotel and that later orders would be given to them.
On May 27, 1920, an auto was sent to the Okino hotel,
the driver saying in the presence of Matsumoto, Saito
and Murakami that the officials of the Hawaii union had
sent for them to get in this automobile, which they did, and
were driven to a tea house some four miles distant from
Hilo.   Here they again met the defendants Ishida, Miya-
mura and Koyama, also a man named Yoshimura who
was said to be one of the pickets from Ewa, Oahu.  Miya-
mura stated to Matsumoto, Saito, Murakami and Yoshi-
mura, in the presence of the others, that orders had been
received from the federation office at Honolulu as to what
they were to do; that they were to keep the matters
secret and were to swear that they would not disclose
the matters that were to be discussed there but that if
they did disclose them and thereby bring damage to the
strike the federation would publicly condemn their names
and those of their relatives in Japan.   The four men
promised not to disclose, whereupon Miyamura told them
that there was a man named Sakamaki, who lived at
Olaa, who was obstructing the cause.   He told them to
kill this man with powder, to use powder on his build-
ing and to kill him.   The four men agreed, whereupon
Miyamura took them outside, one at a time, and gave
each of them $100 and told them to do their best.  Matsu-
moto, Saito and Murakami then returned to their hotel
in Hilo.   Early next morning Miyamura came to the
hotel and told Matsumoto, Saito and Murakami that he
could not find Yoshimura; that Yoshimura had paid
his bill at the hotel and run away; that he did not think
that Yoshimura would disclose the conversation of the
night before and that in case they should run away he
would notify the home government and publicly suppress
the names of their families living in Japan, and that in

case they were successful in the dynamiting they would
be paid $5000 each, adding that they had come to Hilo
for the cause of 25,000 laborers and if they were going
to help he wanted them to succeed in this undertaking.
These three men then said that if the killing of Sakamaki
with powder would help the cause of the 25,000 laborers
they would do so.   That morning one of the three—
Murakami—left for Honolulu, from whence he returned
to Hilo on the "Mauna Kea" on the morning of June 3,
1920, the day on which the injury to Sakamaki's house
occurred, bringing with him from Honolulu some dyna-
mite.   Saito testified that Murakami told him that he
had gotten the dynamite from the Oahu union.   Mura-
kami informed Matsumoto and Saito that everything was
ready, that they would do the work that night and that
he, Murakami, would leave for Honolulu the following
day.   That night Murakami, Saito and Matsumoto went to
Olaa and dynamited the house of Sakamaki.   The follow-
ing morning Matsumoto went to the office of the Hawaii
union and obtained $50 which he gave to Murakami for
his passage money to Honolulu and Murakami sailed for
Honolulu, Saito and Matsumoto remaining for some time
in Hilo.   Shortly after this, Matsumoto went to the office
of the Hawaii union where he saw the defendants Miya-
mura, Koyama and Ishida.   He told Ishida that Saito
had suggested that he and Matsumoto had better return
to Honolulu.   Ishida said that it was a good plan, for
the police were making a rigid investigation.   Ishida told
Matsumoto to go back to his hotel and wait for him and
that he would bring him the money for their trip.   A lit-
tle later Ishida delivered the passage money and Matsu-
moto and Saito returned to Honolulu.

Shortly after his return to Honolulu, Matsumoto went
to the federation headquarters where he saw the de-
fendants S. Sato, Tsutsumi, Hoshino, Miyazawa, Goto, Y.

Sato, T. Baba, E. Yokoo, F. Koyama, K. Takizawa, K. Furusho, S. Tomoda, Kondo and Fujitani. Tsutsumi and Hoshino both told Matsumoto that he had made a success of his work in Hilo and that they had received a report from Hilo that all the spies there were now afraid and that it was a great success. The defendant Baba thanked Matsumoto, stating that he had done well the work he had gone to do. The defendants Takizawa, Kawamata, Furusho, Tomoda, Goto, Miyazawa, Kondo, Ishida, S. Sato and Y. Sato (Y. Sato was not apprehended) thanked him for the work he had done in Hilo in damaging the house of Sakamaki and said it was a great success and that on account of the work he had done the cause was a success. The witness Saito also had a similar talk with some of the defendants.

Matsumoto and Saito, being unable to obtain their promised reward of $5000 from the officials in Honolulu, again went to Hilo where they interviewed the defendants S. Sato, Hoshino and Ishida. These defendants informed the two witnesses that if the officials in Honolulu refused to pay this money the Hawaii union would pay it, Hoshino stating that he was one of the officers of the federation and that he would have the thing settled. Matsumoto and Saito then returned to Honolulu. Later Hoshino met Matsumoto in Honolulu and promised to present his claim to the federation. Shortly after this Matsumoto had an altercation with Tsutsumi which ended in Matsumoto's being assaulted, on account of which he lodged a complaint against Tsutsumi with the city and county authorities. Matsumoto was approached by the defendants Baba and Kondo who told him his claim would be settled and that he should withdraw his charge of assault and battery. Kondo at that time gave Matsumoto $300 to pay for the injury received by Matsumoto when assaulted by Tsutsumi. Matsumoto threatened to con-

fess the dynamiting matter to the police. Kondo asked him to keep quiet and guaranteed to get for him the promised reward. Later Kondo said to Matsumoto that he had done his best but was unable to obtain the money. Thereafter Matsumoto confessed to the police authorities.

S. Suzuki testified on behalf of the prosecution that shortly before the dynamiting, he had brought dynamite from Maui and informed the defendants' Tsutsumi, S. Sato and C. Hoshino of that fact. About a week later at the request of the defendants Furusho and Kawamata, he delivered the giant powder to them at the federation office. On May 5, 1920, Suzuki again went to Maui and procured more dynamite, some of which, together with caps and fuse, he gave to E. Yokoo (one of the unapprehended alleged conspirators).

It is the contention of counsel for defendants that the evidence adduced did not show the existence of a conspiracy on the part of defendants to commit the offense charged in the indictment hence all of the evidence of acts and declarations of alleged conspirators as testified to by the witnesses Matsumoto and Saito was incompetent. With this contention we cannot agree for there was, as shown above, an abundance of evidence tending to show the existence of a conspiracy and that all of the defendants were implicated therein. The exceptions on the ground that the court erred in allowing the acts and declarations of alleged conspirators to be admitted are overruled.

The giving of the following instruction for the prosecution is one of the errors assigned: "I further instruct you that if you find and believe from the evidence beyond a reasonable doubt that J. Sakamaki mentioned in the indictment was obstructing the interests of the Japanese strikers and that some two or more of the persons charged in the indictment did, within the jurisdiction of this

court and within the time set forth in these instructions maliciously or fraudulently combine or mutually undertake or concert together to cause by unlawful means the said J. Sakamaki to cease his endeavors to obstruct the interests of the said Japanese strikers and that thereafter others of the defendants did become parties to such combining, undertaking or concerting, or did knowingly participate therein, either on Oahu or on Hawaii, and that in pursuance of the common purpose certain of the persons mentioned in the indictment did unlawfully use and cause to be exploded dynamite or giant powder in the manner alleged in the indictment, at Olaa, District of Puna, County of Hawaii, then you will find all of said defendants guilty as charged, even though the particular means by which the said purpose was to be obtained had not been determined at the beginning and even though such means were not known to all the defendants so long as the act done was the reasonable and probable result of, and reasonably calculated to accomplish, their said purpose." Counsel for defendants contend that this instruction authorized the jury to convict without having found that the crime was committed by the defendants in the manner alleged in the indictment. It is contended that while the indictment charges defendants with conspiracy to commit the specific offense of unlawfully using dynamite, the jury was instructed to find defendants guilty upon proof of a conspiracy on the part of defendants to cause by unlawful means Sakamaki to cease his endeavors to obstruct the strike. An examination of the instruction complained of does not bear out this contention. It is of course elementary that defendants could be convicted only of the crime charged in the indictment and the jury was explicitly instructed to that effect by defendants' instruction No. 2, in which the court told the jury that "before you can convict any one of the de-

fendants it must be clearly proved beyond all reasonable doubt that he conspired with some other person indicted with him to commit the identical offense charged. They must have been cooperating as conspirators having one common design, for in the absence of a common design there can be no conviction for the act of a mere associate." There was evidence in the case from which the jury might have perhaps inferred that all the details of the conspiracy such as is here involved were not determined upon at one time. From the evidence it could well be inferred that certain of the defendants in Honolulu conspired together to, by unlawful means, for example, by violence towards Sakamaki, remove his opposition to the strike. These conspirators in Honolulu may not at the outset have agreed as to the precise unlawful and violent means to be adopted, but, in the light of all of the evidence, the jury could well have found that they contemplated that violence towards Sakamaki would be resorted to leaving the precise means to be adopted by those of their co-conspirators who were stationed in Hilo. The defendants in Hilo adopted dynamite as the means to be employed towards silencing Sakamaki's anti-strike activities, and that means being one that was reasonably and probably adapted and calculated to accomplish by violence the unlawful purpose in view, all of the defendants are chargeable with the means thus resorted to by their co-conspirators. "A conspiracy may be inferred where it is shown that any two or more of the parties charged aimed, by their acts, to accomplish the same unlawful purpose or object, one performing one part and another another part of the same, so as to complete it, although they never met together to concert the means or to give effect to the design." *United States* v. *Sacia,* 2 Fed. 754; *The Mussel Slough Case,* 5 Fed. 680. "Conspiracy implies concert of design and not participation in every detail

of execution. Nor is it necessary that the plan of a com-
bination shall embrace in detail in its early stages the
various means by which it is to be executed, as it is
sufficient that there is a general plan to accomplish the
result sought by such means as may from time to time be
found expedient." 12 C. J. 545.

If the jury had found that the acts of the defendants
on the island of Hawaii were the product of an inde-
pendent conspiracy, not connected with nor in further-
ance of a conspiracy that had originated in Honolulu, or
that the means adopted by defendants in Hilo to silence
Sakamaki were not reasonably and probably calculated
to accomplish the purpose of the Oahu conspirators, no
conviction of the defendants would have been warranted,
and the trial court was careful so to instruct the jury,
giving the following instructions:

(4) "I instruct you, gentlemen of the jury, that if
you find that the acts at Olaa were in consequence of an
agreement or conspiracy & formed entirely at the tea
house in Hilo, & not in furtherance of the conspiracy
formed on Oahu, then under this indictment you must
find all of the defendants not guilty as the venue is laid
in Oahu."

(8) "If you are not satisfied beyond all reasonable
doubt that a common design as determined upon by de-
fendants contemplated the acts committed in Olaa or if
you believe that the violence at Olaa may have been the
unauthorized and individual acts of some one or more of
the defendants acting upon their own responsibility and
volition and not in furtherance of the common design,
then the other defendants cannot be held responsible and
you must find them not guilty."

"The addition of new parties after a conspiracy is
formed does not necessarily destroy the identity of the
conspiracy but it continues as the same conspiracy.
*United States* v. *Nunnemacher*, 7 Biss. 111." Note, 3
Am. St. Rep. 477. "The rule is that each conspirator is

responsible for everything done by his confederates which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. In other words, the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of or foreign to the common design." Note in *Spies* v. *People,* 3 Am. St. Rep. 477, and cases cited. "Where there is a conspiracy to accomplish an unlawful purpose, and the means are not specifically agreed upon or understood, each conspirator becomes responsible for the means used by any co-conspirator in the accomplishment of the purpose in which they are all at the time engaged." *Republic* v. *Yamane,* 12 Haw. 189, 207. "If several persons take several steps all tending towards one obvious purpose, it is for the jury to say whether those persons had not combined together to bring about that end which their conduct so obviously appears adapted to effectuate. *Regina* v. *Duffield,* 5 Cox C. C. 404." Note, 3 Am. St. Rep. 476.

Perhaps from the facts in this case the prosecution might well have charged defendants with a conspiracy to do bodily violence to Sakamaki, or to destroy his house, and have omitted from the indictment any mention of the means resorted to for that purpose, but inasmuch as an overt act was committed in furtherance of the design of the conspiracy, the charge that the conspiracy was formed for the commission of the offense constituted by such overt act was proper. As said by Cooley, C. J., in a case where the charge was a conspiracy to defraud generally: "A better method no doubt would have been, when the fraud had been actually accomplished, to allege a con-

spiracy to cheat and defraud the bank which was actually defrauded, for the overt act had then made specific and certain what before was general and uncertain." *People v. Arnold,* 46 Mich. 268, 272.

In the light of all of the evidence adduced in this case we are of the opinion that the trial court committed no error in giving the instruction complained of.

Another exception is to the giving of the following instruction on behalf of the prosecution:

"I further instruct you that if you find from the evidence beyond a reasonable doubt that the acts at Olaa were in consequence of an agreement formed at the tea house at 4 Miles near Hilo and that such agreement was in furtherance or continuation of a conspiracy formed on Oahu, such evidence is sufficient to prove that the conspiracy charged in the indictment was, as a matter of law, committed on Oahu."

At the request of counsel for defendants the trial court also instructed the jury in this connection that:

"If you find that the acts at Olaa were in consequence of an agreement or conspiracy & formed entirely at the tea house in Hilo, & not in furtherance of a conspiracy formed on Oahu, then under this indictment you must find all of the defendants not guilty as the venue is laid in Oahu."

If the unlawful agreement be entered into in one county, and the conspirators go into another county to execute their plan of mischief, and there commit an overt act, such overt act of any one of the conspirators, in furtherance of the common design is considered in law a renewal or rather continuance of the original agreement by all the conspirators and the venue may be laid in the county where the agreement was entered into or where an overt act was done by any of the conspirators in furtherance of their common design. "In such case we are to view the overt act, wherever committed, as a renewal

of the original conspiracy by all the conspirators." Whart. Cr. L., Sec. 1664. See *People* v. *Mather,* 4 Wend. 229. In the case of *Commonwealth* v. *Corlies,* 3 Brewst. (Pa.) 575, the contention was that there was no evidence of a conspiracy in the State of Pennsylvania; that if any conspiracy existed at all it was in the State of New York, to which jurisdiction defendants could be held accountable. The court said, p. 578, "In conspiracy the offense undoubtedly is the combination; when that is established the crime is complete. The overt act is evidence of the crime." In the instant case there was ample evidence from which the jury could infer that the conspiracy complained of was formed in Honolulu and that all of the acts on Hawaii were but a renewal or continuance of the conspiracy which originated in Honolulu. Such being the case the instruction complained of, qualified as it was by the instruction given at defendants' request, was properly given. The exception is overruled.

Exceptions 34, 35 and 36 are to the giving of the following instructions on behalf of the prosecution:

"I further instruct you that if you find from the evidence beyond a reasonable doubt that the overt acts were committed, the fact that one or more of the defendants may not have participated in the doing of said overt acts would be no defense, provided you further find that such defendants were parties to a conspiracy to do the same with those who actually did the said act as when the conspiracy is once established the acts and declarations of any one conspirator in furtherance of the common design become the acts and declarations of all. They are in the eyes of the law, one man; they breathe one breath; they speak one voice; they wield one arm, and the law says that the acts, the words, the declarations of any of them, while in pursuit of the common design, whatever unlawful means are chosen by him in pursuit of the common design are the acts, the words and the declarations of all."

"I further instruct you that the evidence in proof of a conspiracy will, in general, be circumstantial and although the common design or plan in the minds of the alleged conspirators is a necessary element in the crime charged, it is not necessary to prove that the defendants came together and actually agreed, in terms, to have that design or plan and to follow it together. It is sufficient if you believe from the evidence beyond a reasonable doubt, from the acts and/or declarations of the parties and from all the facts and circumstances in evidence, that the defendants did pursue a common design or plan by any of the unlawful means charged in the indictment, one performing one part and another another part, so as to accomplish the common object; and if you so believe, beyond a reasonable doubt, then you are justified in the conclusion that the defendants were engaged in a conspiracy to effect such common object by unlawful means and you should return a verdict of guilty as charged."

"I further instruct you, as a matter of law, that all who take part in a conspiracy after it is formed and while it is in execution, and all who, with knowledge of the facts, concur in the plans originally formed and aid in executing them, are fellow-conspirators. Their concurrence, without proof of an agreement to concur, is conclusive against them. They commit the offense when they become parties to the transaction or when they further the original plan."

These instructions fairly and properly state the law applicable to the case and the exceptions to the same are overruled.

Exceptions 37, 38 and 39 are to the verdict, the judgment and sentence and the denial of a motion for a new trial. Evidence in the case being amply sufficient to warrant the verdict of the jury, these exceptions are overruled.

Exception 6 is to the denial of the motion to strike the testimony of Matsumoto to the effect that Saito told the witness that Murakami told Saito that he, Murakami, had brought some powder from Honolulu which he in-

tended to use. The motion was that the testimony "be stricken as hearsay; no showing of any conspiracy as charged." This exception relates to a conversation which took place in the automobile near the scene of the explosion. At that time there were seated in the automobile Murakami, Saito and Matsumoto. Murakami, who is one of the defendants, being present at the time, it is doubtful whether the testimony is hearsay, but even if it be so considered, its admission does not constitute prejudicial error since Saito himself testified that Murakami on the same occasion told him "I got some powder that has been kept by the Oahu union and we have to do this work right away." Where hearsay evidence has been improperly admitted but there is other evidence covering the same ground, the error is cured. *The King v. Akana,* 7 Haw. 549, 552; *Territory v. Dengiro,* 15 Haw. 64, 66. "The admission of incompetent evidence of a material fact is an error without prejudice when the fact is proved by other competent and undisputed evidence." *Matsumoto v. County of Hawaii,* 19 Haw. 496. Exception overruled.

Exception 2 is to the denial of a motion to strike as hearsay the testimony of Matsumoto to the effect that the driver of the automobile told the witness in the presence of Murakami and Saito that the officials of the Hawaii labor union wanted these three men to go on the automobile to the tea house near Hilo. Matsumoto had previously testified that when he reported to the officials at Hilo for orders he was told to go back to his hotel and that later orders would be issued to him. Later an automobile came to the hotel and in the presence of Murakami, Matsumoto and Saito, the driver stated that the officials of the Hawaii labor union wanted the three men to ride in this automobile, which they accordingly did and were driven to the tea house. In view of the evi-

dence that the labor officials had indicated that orders to these men would soon be forthcoming, the admission of the statement of the driver of the automobile was harmless. Exception overruled.

Exceptions 7, 8, 9 and 10 are to the admission of conversations between Matsumoto and Saito after the consummation of the purpose of the alleged conspiracy.

It appears from the transcript that, over the objection of counsel for the defendants, the witness Matsumoto was allowed to testify to certain conversations he had in Hilo, on the steamer and in Honolulu with Saito shortly after the explosion. This evidence was admitted at a session of court on Friday. At the opening of the next session of court on Monday morning, the court said:

"Gentlemen, before we proceed this morning, on Friday I overruled an objection to some testimony, and upon reflection I think that I should have sustained the objection. Judge Lymer, it was this, permitted against the defendants' objection: testimony showing conversation between Saito and Matsumoto after the - - - after testimony had been introduced tending to show that Sakamaki's house had been injured by explosion, a conversation entirely between Saito and Matsumoto, about being better for them to get out of town or something of that sort,— I don't know that I quote the exact language. I don't think that any conversation between Saito and Matsumoto after the consummation of the alleged conspiracy, had between them alone in the absence of any of the other defendants, is admissible, because Saito and Matsumoto are not now under indictment and I don't think that it is admissible, and I am going to correct what seems to me to have been an error in the admission of it, and I will sustain your objection to that evidence and I will now instruct the jury that they are not to consider it at all. I regret that the reason for sustaining your objection did not occur to me at the time.

"Gentlemen of the jury, you have heard what I have said to Judge Lymer and I will ask you not to consider

the testimony that was offered on Friday of a conversation between Saito and Matsumoto in Hilo after the explosion - - - testimony tending to show the explosion. You will not consider that evidence at all, nor any evidence of conversation between Matsumoto and Saito on the boat coming back from Hilo to Honolulu. No conversation between Saito and Matsumoto after the alleged explosion, —just conversation held between the two of them,—would be admissible in evidence and you will not consider that testimony at all; you will dismiss that testimony from your minds and in your consideration of the case you will not pay any attention to that at all. Is that explanation sufficient, gentlemen?

"Mr. Lymer: I think your Honor's statement is absolutely correct, only we wish the record to show that the defense feels that this mode of correction does not cure the error in your Honor's prior ruling. Other than that your Honor has dealt with it adequately and fairly. Your Honor gets my point?

"The Court: Yes.

"Mr. Lymer: We wish to make the contention and we do claim that a somewhat belated instruction of this nature does not cure the error. Otherwise, your Honor, we agree that - - -

"The Court: Very well. You may proceed, gentlemen."

When the case was submitted to the jury the court also instructed the jury as follows:

"Gentlemen of the jury, I instruct you that the defendants in this case stand charged in the indictment with the crime of conspiracy in the first degree. You are the exclusive judges of the facts in this case and the credibility of the witnesses, but the law you must take from the court to be the law notwithstanding any opinion that you might have as to what the law is or should be."

"I further instruct you that the declarations of a conspirator after a conspiracy has ceased to exist and which are merely narrative of past events shall be considered against such conspirator only and shall not be considered evidence against any other conspirator not present at the

time such declarations were made. If such other conspirator were present, however, when such declarations were made and heard them and expressly or by implication acquiesced in them, then the same may be considered against such other conspirator."

In *Kaleleonalani* v. *Smith,* 4 Haw. 82, 86, the trial court had admitted incompetent evidence. After all the evidence was in the court instructed the jury that that evidence had failed altogether, that it must be excluded from consideration because it had proved nothing. On exceptions to this court this court said "if evidence has been wrongly admitted because it was incompetent or irrelevant, and if the judge shall, upon its appearing to be such, instruct the jury to disregard it, it is not a ground of exception. The jury is sworn to render verdict according to law, and, by our statute, must receive the law from the court. When the court has instructed that something which they have heard is not to be considered by them, we must presume in favor of their oath and public duty. It is true this presumption might be overcome by their rendering a verdict which had no evidence to support it but that which had been excluded by the court." See also *Stone* v. *Hutchinson,* 4 Haw. 117 at 121.

In *The King* v. *Paakaula,* 3 Haw. 30 at 34, the court said: "It is contended further by the counsel for the prisoners that as testimony was admitted on the trial which was subsequently ruled out, the presumption is that it left an impression on the minds of the jury adverse to the prisoners, and therefore a new trial should be granted. It occasionally happens that testimony is admitted and subsequently ruled out; but in such cases the court should expressly declare to the jury, as was done in this case, that the testimony is to be entirely disregarded, and it is the solemn duty of the jury to regard the charge. This

is not unfrequently done in the course of a trial, but it is a new doctrine that it should defeat the whole proceedings."

The court having ordered the offensive evidence stricken and carefully instructed the jury to disregard the same and there being ample other evidence to support the verdict, we are of the opinion that no such error has been committed as to warrant the granting of a new trial.

Exceptions 25 and 26 are to the allowing of the defendant Miyazawa to be cross-examined as to other crimes not shown to have been committed. The defendant Miyazawa took the stand and was examined at considerable length. He testified that he was one of the secretaries of the federation and denied any knowledge of or connection with the alleged conspiracy. He identified the constitution and by-laws of the federation, also certain circulars that were circulated and articles that were published during the strike, all of which were offered and received in evidence on behalf of defendants as tending to show that the federation deprecated violence and counseled that only peaceful methods be used in the settlement of the strike. This defendant testified that he and another man were the authors of the circulars and publications mentioned. He admitted that pickets were maintained on the various plantations and gave further evidence concering the federation, its officials, the scope of its activities and operations. On cross-examination, over the objection that it was incompetent, irrelevant and immaterial and not proper cross-examination, the prosecution was allowed to interrogate this defendant as to whether he knew of any dynamite having been placed under the house of a man at Ewa during the strike; whether he knew anything about the placing of dynamite by certain Japanese under the house of a Filipino at Waipahu during the months of April or May, 1921, because this

Filipino was working against the strike. Defendant answered these questions in the negative and was then asked whether he knew anything about an assault committed on a Filipino at Waipahu on March 10, 1920, by the defendant Furusho and certain others, to which defendant answered that he knew of that case because it was tried in court and upon a conviction carried to the supreme court where it was subsequently stricken because a transcript had not been furnished.

Just how far the discretion of the trial court will be interfered with for permitting a wide range in the cross-examination of a defendant who testifies on his own behalf, the authorities are somewhat in conflict, but all the authorities agree that the limit of cross-examination is largely a matter in the sound discretion of the court.

In the present case the facts which were apparently sought to be established by this witness and the documentary evidence were that it was improbable that either the defendant or the organization with which he was connected had participated in the alleged conspiracy to commit violence, because this defendant and the organization had discountenanced all resort to violence. Such being the nature of the evidence given, the prosecution was entitled, by cross-examination, to subject the witness to a searching examination as to the truth or falsity of the evidence given. "When a party places a witness upon the stand to testify to facts which tend to support his side of the issue involved, and questions him concerning such facts, it is the right of the opposite party, on cross-examination, to go as fully into the subject as may be necessary to draw from the witness all he may know concerning the transaction about which he has testified, and to put before the jury any pertinent facts which will have a tendency to controvert the testimony which has been given by the witness in favor of the party calling him.

A more restricted rule renders cross-examination in many cases nearly valueless, and enables a party, by careful questions to his witness, to give to the jury a one-sided and partial view of the facts within the knowledge of the witness, and effectually to preclude the opposite party from supplementing the witness's statement with the further facts within his knowledge concerning the same transaction." *Detroit & Milwaukee R. R.* v. *Van Steinburg,* 17 Mich. 99, 109. "The scope and extent of the cross-examination of a witness is largely a matter of administration by the presiding judge. It is a question for him to determine in each case, guided by sound reason. Ordinarily much latitude will be given. The apparent knowledge of the witness, accompanied by an evident inclination to withhold it from the court, his power to understand the situation and remember facts, his interest or bias and the like are all factors which will be considered by the presiding judge in this connection, having in view in each case, the discovery of the truth. According as the necessities of the case may seem to him to require, he may limit or extend the scope of the cross-examination. If, in his judgment, it is being unreasonably protracted he may refuse to permit it to be further extended; if on the other hand he deems it essential to the discovery of truth, he may allow a wider latitude." Chamberlayne on Ev., Sec. 3723. "The allowance or exclusion of questions as to irrelevant facts is a matter of administration by the presiding judge, in the exercise of sound reason." Chamberlayne on Ev., Sec. 3726.

Under the facts in this case we are not prepared to say that the judge erred in permitting the cross-examination complained of.

Exception 27 is similar to exceptions 25 and 26 and relates to the allowing of cross-examination of the defendant Kawamata. Under all the facts in the case we

are of the opinion that the circuit judge did not abuse his discretion in allowing the cross-examination complained of.

Exceptions 17, 18, 19 and 20 are to the admission of evidence by the witness Suzuki regarding dynamite. This witness having testified that he had brought giant powder from Maui further testified that the defendants Furusho and Kawamata came to him and told him to hand over to them the giant powder that he had brought; that he asked them what they wanted to use it for and they said they wanted to blow up Kipapa bridge. The witness further testified that he gave two sticks of dynamite to Furusho in the early part of April, 1920, at the federation office in the presence of the defendant Kawamata. The same witness also testified that at a tea house in Honolulu a few days before May, 1920, he had a talk with the defendants Tsutsumi and Sato who asked him to get a pistol and giant powder. The witness further testified that he had gone to Maui and procured more dynamite which he gave to various of the defendants. Counsel for the defense moved to strike all of the evidence of this witness concerning the dynamite on the ground that it was not competent, relevant or material and had no bearing on the issues involved. The motion to strike was properly overruled for it was clearly within the province of the prosecution to show that defendants were in the possession of dynamite, the instrument with which the overt act was committed.

All of the other errors assigned have been carefully considered and we find no merit in them. The exceptions are overruled.

W. H. Heen, City and County Attorney (H. E. Stafford, First Deputy, City and County Attorney, with him on the brief), for the Territory.

S. B. Kemp, W. B. Lymer and Marguerite K. Ashford

(*Watson & Lymer, Marguerite K. Ashford* and *S. B. Kemp* on the briefs) for defendants.

CONCURRING OPINION OF PETERS, C. J.

One of the appellants' counsel complains that the indictment herein is uncertain and therefore insufficient and fatally defective for the reason that the acts, to wit, "combination or mutual undertaking or concerting together" and the terms descriptive of those acts, to wit, "malicious and fraudulent," contained in the statute defining conspiracy (Sec. 4076, R. L. 1915), as well as the means employed and the unlawful purposes to be effected as enumerated in the statute defining the offense of unlawful use of explosives (Sec. 4028, R. L. 1915), are alleged in the alternative.

Section 4076, R. L. 1915, defines conspiracy as follows: "A conspiracy is a malicious or fraudulent combination or mutual undertaking or concerting together of two or more, to commit any offense or instigate any one thereto, or charge any one therewith; or to do what plainly and directly tends to excite or occasion offense, or what is obviously and directly wrongfully injurious to another."

Section 4028, R. L. 1915, defines the unlawful use of explosives as follows: "Any person unlawfully using dynamite or other explosive chemical or substance for the purpose of inflicting bodily injury upon, or to terrify and frighten, any person, or to injure or destroy any property, or damage the same in any manner, shall be liable, upon conviction, to pay a fine of not less than two hundred and fifty dollars, nor more than five thousand dollars, and to imprisonment at hard labor for a term not to exceed twenty years."

Ordinarily where a statute defining a criminal offense enumerates in the disjunctive two or more acts, the com-

mission of any one of which would constitute a separate and distinct offense, such acts may not be alleged in the alternative in the same count of an indictment. Nor may two or more intents be alleged in the alternative in the same count of an indictment as qualifying a single act denounced in a statute as criminal when committed with any one of such intents. To do so renders the count of the indictment uncertain and hence insufficient and fatally defective. All allegations in the alternative are not, however, fatal to an indictment. There are several generally accepted exceptions to the rule, within which the alternative allegations found in both counts of the indictment herein fall.

Were both counts of the indictment in the instant case within the rule and the provisions of the simplified Criminal Procedure Act (Sec. 3791D, R. L. 1915, Act 215, S. L. 1915) incapable of curing the defect nothing that the defendants might do either expressly or by implication could alter the situation and they would be entitled to their discharge upon appropriate proceedings attacking the sufficiency of the indictment. That the defendants under such circumstances failed to demur to the indictment or expressly stated that they understood it or expressly agreed that the indictment should read differently than it does and that the uncertainty now complained of should be removed by the substitution of certainty, would be immaterial. Failure of an indictment to state facts sufficient to constitute an offense against the law is jurisdictional and is available to the defendant at any time. The fifth article of the amendments of the Constitution provides that "No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury * * *." Article VI of the amendments of the Constitution provides: "In all criminal prosecutions the

accused shall enjoy the right  *  *  *  to be informed
of the nature and cause of the accusation  *  *  *." The
effect of these provisions is to entitle the defendant,
charged with a capital or otherwise infamous crime (the
crime of conspiracy in the first degree is an infamous
one), to be informed of the nature and the cause of the
accusation against him by an indictment as known at
common law. *Mott* v. *State,* 29 Ark. 147, 149; *Eason* v.
*The State,* 11 Ark. 481, 500; *State* v. *Kyle,* 166 Mo. 287,
56 L. R. A. 115, 120; *Ex parte Slater,* 72 Mo. 102, 106;
*Hewitt* v. *State,* 25 Tex. 722; Joyce on Indictments, Secs.
11, 12. These provisions of the Constitution cannot be
waived. They are not solely for the benefit of the accused.
The public is interested. *Renigar* v. *The United States,*
172 Fed. 646, 656; *Ex parte McClusky,* 40 Fed. 71, 74.
An indictment as thus defined is essential to the court's
jurisdiction. *Renigar* v. *United States, supra; Ex parte
McClusky, supra; Ex parte Bain,* 121 U. S. 1, 12.

The question of waiver is not involved because both
counts of the indictment are good. And this is so irre-
spective of the provisions of Act 215, S. L. 1915.

Where the words or terms alleged in the alternative
are synonymous an indictment is not within the rule
against alternative allegations. The word "combination"
and the phrases "mutual undertaking" and "concerting
together" are synonymous. The legislature certainly did
not intend to make separate and distinct offenses of the
several acts denounced by the statute when maliciously
or fraudulently committed. Under the circumstances
the allegation of the several acts in the disjunctive, that
is to say, that the defendants did "combine or mutually
undertake or concert together" does not render the in-
dictment bad.

Nor does the description of the "combination or mu-
tual undertaking or concerting together" as "malicious or

fraudulent" render the counts of the indictment fatally de-
fective. These terms are obviously not synonymous.
Both terms are contained in the statutory definition of
the offense. But where after the rejection of allegations
in the affirmative the indictment or counts of an indict-
ment containing such allegations fully advise the de-
fendant of the nature and the cause of the accusation
against him, the constitutional requirements have been
fully met.

Conceding to the authorities the effect that the in-
dictment by reason of the alternative allegation "ma-
liciously or fraudulently" neither charges that the "com-
bination or mutual undertaking or concerting together"
was "malicious" nor "fraudulent" I am of the opinion
that even after the rejection of both terms and consider-
ing the indictment as though both terms were absent
therefrom the indictment is sufficient. To unlawfully use
dynamite or other explosive chemical or substance for
the purpose of inflicting bodily injury upon or to terrify
and frighten any person or to injure or destroy any prop-
erty or damage the same in any manner is a malicious
act as the term "malicious" is defined by section 3663, R.
L. 1915. The object of the conspiracy as alleged in the
indictment was "to unlawfully use, and cause to be ex-
ploded dynamite or other explosive chemical or substance
for the purpose of inflicting bodily injury upon one J.
Sakamaki, or to terrify and frighten him, the said J.
Sakamaki, or to injure, destroy or damage a certain
house   *   *   *   which said house was being occupied by
the said J. Sakamaki as his place of abode   *   *   *."
The object of the conspiracy was therefore malicious.
The conspiracy was thereby rendered malicious. The in-
dictment therefore alleges the conspiracy as malicious.

Ordinarily where a statute attaches to an offense cer-
tain technical predicates these predicates must be em-

ployed in an indictment charging such offense.  As a rule it is not prudent to substitute other terms for those employed in the statute.  But it may be done where the word or term substituted is equivalent to the word or term used in the statute or is a more extensive signification and includes it.  *People* v. *Vance,* 21 Cal. 400; *Williams* v. *State,* 64 Ind. 553; *State* v. *George,* 34 La. Ann. 261; *Roberts* v. *State,* 55 Miss. 421; *State* v. *Watson,* 65 Mo. 115; *Tully* v. *People,* 67 N. Y. 15; *Eckhardt* v. *People,* 83 N. Y. 462; *State* v. *Thorne,* 81 N. C. 555; *United States* v. *Nunnemacher,* Fed. Cas. No. 15,903; *King* v. *Brady,* 1 Bos. & Pul. 187, 126 Eng. Rep. 851.

A conspiracy may be "malicious" or "fraudulent" accordingly as its object is a malicious or fraudulent act or the means to be employed be malicious or fraudulent although the object of the conspiracy be lawful.  The allegation of the malicious object of the conspiracy is tantamount to the allegation of a malicious conspiracy. It is a substitute of the technical predicate "malicious" as contained in the statutory definition of conspiracy. The language of the indictment inevitably implies that the conspiracy was malicious.  The allegations of the object of the conspiracy qualify and describe the conspiracy.  They supply and in terms are a substitute for the word "maliciously" as fully as though the word "maliciously" were present in the indictment.  The indictment fully advised the defendants that they were charged with a malicious conspiracy to terrify and frighten J. Sakamaki or inflict bodily injury upon him or injure or destroy his property by the unlawful use of dynamite or other explosive chemical or substance.

A case peculiarly in point is that of *Tapack* v. *United States,* 220 Fed. 445.  There the defendants were charged under section 5440 of the Revised Statutes of the United States (Sec. 37, Penal Code of 1909) with conspiracy to

violate the provisions of section 29b (1) of the Bankruptcy Act, which made it an offense for any one to "knowingly and fraudulently" conceal while a bankrupt or after his discharge, from his trustee, any of the property belonging to his estate in bankruptcy. In substance the indictment charged that the defendants in order to defraud the creditors of the bankrupts did corruptly, wickedly and unlawfully conspire, etc., with the bankrupts to conceal their property and to continue to conceal the same after they should be adjudicated bankrupts and that after the adjudication in bankruptcy they did secrete and conceal the said property and continued to secrete and conceal the same. The words "knowingly and fraudulently" were omitted from the indictment and those terms as descriptive of the act of concealment as contained in the statute defining the offense which was the object of the conspiracy were totally absent. The court sustained the indictment using the following language (p. 447): "In earlier days, when excellent reasons existed for construing an indictment strictly so as to favor life and liberty, it is probable enough that such an indictment as this might have been held deficient in precise statement; and, indeed, some comparatively recent decisions still reflect something of the earlier spirit. But there can be no doubt that the prevailing tendency now, both in statute law and in decision, is to be satisfied with substance rather than to insist upon rigid adherence to form; an indictment will be held good if it substantially charge the particular offense for which the defendant is about to.be, or has already been, tried. *Burton* v. *U. S.*, 202 U. S. 344, 25 Sup. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 362; *Dunbar* v. *U. S.*, 156 U. S. 195, 15 Sup. Ct. 325, 39 L. Ed. 390; *McNiel* v. *U. S.*, 150 Fed. 82, 80 C. C. A. 36; *State* v. *Stein*, 48 Minn. 466, 51 N. W. 474; *State* v. *Smith*, 63 Vt. 201, 22 Atl. 604; *Worsham* v. *Murchison*, 66 Ga. 715."

Nor do the allegations in the disjunctive of the explosives to be employed and the purposes of their unlawful use render the indictment uncertain or defective. The gist of the offense is the conspiracy. The indictment in terms alleges that the conspiracy was formed to use dynamite or other explosive chemical or substance to accomplish any one of the unlawful purposes denounced by the statute. It charges in effect that although the means to be employed and all the purposes to be accomplished were contemplated by the conspirators the selection of those means and the unlawful use to which they were to be put were optional. In other words, it charges that the defendants conspired to employ alternate means to bring about alternate results. They did not conspire, according to the indictment, to conjunctively use all the means nor to conjunctively accomplish all the purposes enumerated in the statute. Were the substantive offense defined by section 4028, R. L. 1915, the sole subject of the indictment obviously neither the means nor the purposes of the unlawful use enumerated in the statute could properly be alleged in the disjunctive. But here the indictment is conspiracy. However many crimes may have been contemplated by the conspirators the conspiracy to commit such crimes was but a single offense. I see no difference in principle between a conspiracy to .commit some one or all of several criminal acts and a conspiracy to commit several criminal acts. An indictment charging a conspiracy to commit more than one criminal act is not duplicitous. *State* v. *Sterling,* 34 Ia. 443-444; *United States* v. *Aczel,* 219 Fed. 917, 921; *John Gund Brewing Co.* v. *United States,* 206 Fed. 386; *State* v. *Dyer,* 32 Atl. (Vt.) 814, 817; *United States* v. *Eccles,* 181 Fed. 906, 908. The converse is necessarily true that a conspiracy may be formed to commit any one or all of several offenses. If so it should be so alleged and neces-

sarily the offenses which are the alternate objects of the conspiracy should be and could only be alleged in the disjunctive.

By the indictment in the case the constitutional guaranties afforded the defendants were fully observed. It may not be inappropriate to conclude by adopting the language of the United States Supreme Court in the case of *Burton* v. *United States,* 202 U. S. 344, at 372. With the substitution of appropriate language indicating its application to all of the defendants the citation is particularly apt: "* * * the accused was informed with reasonable certainty by the indictment of the nature and cause of the accusation against him * * *. The averments of the indictment were sufficient to enable the defendant to prepare his defense, and in the event of acquittal or conviction the judgment could have been pleaded in bar of a second prosecution for the same offense. The accused was not entitled to more, nor could he demand that all the special or particular means employed in the commission of the offense should be more fully set out in the indictment. The words of the indictment directly and without ambiguity disclosed all the elements essential to the commission of the offense charged, and, therefore, within the meaning of the Constitution and according to the rules of pleading, the defendant was informed of the nature and cause of the accusation against him."

I agree in all other respects with the majority opinion and join in the conclusion that the defendants' exceptions should be overruled.